**Exhibit A**

Page 13

1         K. O'Sullivan
2   Q.  Was there a capital investment in
3 Times Square when it was formed?
4   A.  I don't believe so. I can't remember,
5 I don't believe so.
6   Q.  Since its formation, have there been
7 any capital investments in Times Square?
8   A.  Are you asking did I personally put
9 any money into Times Square?
10   Q.  Did anybody put any money into Times
11 Square?
12   A.  You know, maybe I have -- to be honest
13 with you, I can't remember. Maybe at the
14 beginning, when we took on a new lease, it is
15 possible I contributed money to it.
16   Q.  That would have been in the form of
17 some sort of security deposit for new office
18 space, is that what you are referring to?
19   A.  Yes, I have a letter of credit with
20 the building.
21   Q.  Is that in your name, or in Times
22 Square's name, the letter of credit?
23   A.  It is -- well, let's put it, it is
24 secured by me personally.
25       The exact wording, I'm not sure.

Page 14

1         K. O'Sullivan
2   Q.  Now I'm going to show you a document
3 I'd like to have marked as Kevin O'Sullivan 1. It
4 is two documents. Call it 1-A and 1-B.
5       (K. O'Sullivan Exhibit 1-A, document
6   is headed New York State Department of
7   State, Division of Corporations, Entity
8   Information, marked for identification, as
9   of this date.)
10      (K. O'Sullivan Exhibit 1-B, document
11   is headed New York State Department of
12   State, Division of Corporations, Entity
13   Information, marked for identification, as
14   of this date.)
15   Q.  The first document is headed New York
16 State Department of State, Division of
17 Corporations, Entity Information. It says
18 selected entity name, Times Square Construction,
19 Inc. and then it says current entity name,
20 Navillus Concrete, Inc.
21      Initial department of state filing
22 date February 13, 2006.
23      When Times Square Construction filed
24 with the New York State Department of State,
25 according to this document at least it listed its

Page 15

1         K. O'Sullivan
2 current entity name as Navillus Concrete.
3      Can you explain how that might have
4 come about?
5   A.  No idea.
6   Q.  Were you involved in getting the
7 filings done with the Department of State?
8   A.  In the background, but not really. I
9 wasn't the one who was in contact with them.
10   Q.  Who was?
11   A.  You know, I don't remember. Maybe it
12 was our attorney, I'm not sure.
13   Q.  Well, was Navillus Concrete, Inc. the
14 name of Navillus at the time?
15   A.  No, that's Navillus Concrete is -- if
16 my memory serves me, is an entity that was formed,
17 it is not active is my understanding, it wasn't,
18 anyway, when I used to work with Navillus.
19   Q.  What was it, then?
20   A.  Just to secure the name, that somebody
21 else wouldn't take the name.
22   Q.  When was it that that was done, in
23 other words, that the company Navillus Concrete,
24 Inc. was formed so that no one else would take the
25 name?

Page 16

1         K. O'Sullivan
2   A.  I would think it was incorporated
3 probably 2004 or '5, but I couldn't be sure of
4 that.
5   Q.  All right, and in terms of its
6 corporate structure were you and your brother also
7 50 percent owner each? In other words, you owned
8 half and your brother owned the other half of
9 Navillus Concrete, Inc.?
10   A.  Yes, I would imagine it was a d/b/a.
11   Q.  A d/b/a?
12   A.  Yes. Now, I could be wrong, but I
13 would think, well, maybe I'm wrong, I don't know.
14   Q.  A d/b/a of Navillus?
15   A.  Yes.
16   Q.  So it is possible it wasn't even
17 separately incorporated as a separate entity from
18 Navillus?
19   A.  It is possible, yes.
20   Q.  The second page has the same heading
21 New York State Department of State, division of
22 corporations entity information, current entity
23 name Times Square Construction.
24   A.  Yes.
25   Q.  Navillus Concrete isn't mentioned

Page 17

1  K. O'Sullivan
2  here. The other difference between Kevin
3  O'Sullivan 1-A and B is the date, 1-A is February
4  13, 2006, and 1-B is January 17, 2007.
5      Can you explain why there would have
6  been another filing in January of '07?
7      A.  I have no idea. Change of address?
8      Q.  You are saying that because Joel
9  pointed out the address?
10     A.  Yes, I mean.
11     Q.  Is that speculation, or do you know
12  that?
13     A.  I wouldn't know to be certain, but it
14  would make sense, because that's when we moved in
15  in 2006 to Manhattan, into our office space. So I
16  would imagine we would have done something so we
17  could -- we would have notified everybody of the
18  change of address and stuff, so everything would
19  come straight to Times Square's office.
20     Q.  When exactly did you move to
21  Manhattan, you being Times Square?
22     A.  October, 2006, I believe.
23     Q.  So you just did the change of address
24  for three months later; is that what you are
25  testifying?

Page 18

1  K. O'Sullivan
2      A.  It is quite possible, yes.
3      Q.  Before Times Square moved to
4  Manhattan, Times Square's offices were actually in
5  Navillus's offices, correct?
6      A.  Yes.
7      Q.  Was there any separation of this
8  office belongs to Times Square, this office
9  belongs to Navillus, or was it all intermingled?
10     A.  The particular office?
11     Q.  Yes.
12     A.  Yes, the particular office would be
13  Times Square.
14     Q.  What was that, would you describe that
15  for us?
16     A.  Describe the office?
17     Q.  Yes, how the separation took place, I
18  mean that's not what I mean, you said there was a
19  separate Times Square office even though it was
20  within Navillus's. Where, in Navillus, was that
21  separate Times Square office?
22     A.  In the same premises.
23     Q.  Was it the same office that you had
24  been occupying at Navillus for years?
25     A.  It would be the same, yes.

Page 19

1  K. O'Sullivan
2      Q.  In fact, you were still an officer of
3  Navillus until September; right?
4      A.  Correct.
5      Q.  So for some period of time in 2006,
6  your office was both a Navillus office,
7  simultaneously a Navillus office and a Times
8  Square office; right?
9      A.  I guess if you want to say it that
10  way, yes, for some period of time, yes.
11     Q.  Sometime between the formation of
12  Times Square in February and your resignation in
13  September?
14     A.  Yes.
15     Q.  Was there any other space at the
16  Navillus Long Island City premises that you would
17  have designated as a Times Square office?
18     A.  For Fergal Conefrey, he occupied an
19  office.
20     Q.  Where was that in relation to your
21  office physically; right next door, down the hall?
22     A.  It was just downstairs underneath me.
23     Q.  Fergal was a Navillus employee also;
24  correct?
25     A.  Correct.

Page 20

1  K. O'Sullivan
2      Q.  When did he become a Times Square
3  employee?
4      A.  May, 2006.
5      Q.  The office that he was in downstairs
6  was the office he occupied when he was a Navillus
7  employee; right?
8      A.  Yes.
9      Q.  Is there anyone else, or was there any
10  other space at Long Island City premises that you
11  would designate as Times Square's? You mentioned
12  yours and Fergal's?
13     A.  We -- Tony Del Greco occupied another
14  office.
15     Q.  Where was that, that the premises were
16  physically?
17     A.  Downstairs.
18     Q.  He had also been a Navillus employee;
19  right?
20     A.  Right.
21     Q.  When did he cease being a Navillus
22  employee and become a -- well, withdrawn, when did
23  he become a Times Square employee?
24     A.  I would think May, 2006.
25     Q.  Now, when he became a Times Square

Page 25

1      K. O'Sullivan
2    A.  Yes.
3    Q.  When did she become a Times Square
4  employee?
5    A.  I would say early 2006.
6    Q.  What was her job at Navillus?
7    A.  She was -- there was a break period,
8  she worked for Navillus then she moved to Ireland,
9  then she came back. So her duties before she
10 left, she was Fergal's assistant.
11   Q.  And after she came back she was?
12   A.  You know, I can't quite remember did
13 she come back and come straight into Times Square,
14 that's quite possible. Did she work for Navillus
15 for a very short period of time, I can't be sure.
16   Q.  Do you know when she came back?
17   A.  I can't be sure of that either.
18   Q.  She is currently Fergal's assistant;
19 right?
20   A.  At Times Square.
21   Q.  At Times Square.
22   A.  No, not -- she is --
23   Q.  What does she do at Times Square?
24   A.  She is -- she helps out in all
25 aspects, sending out drawings, collecting bids,

Page 26

1      K. O'Sullivan
2  requisitions, she wears a lot of hats.
3    Q.  She is in the office?
4    A.  In the office, yes.
5    Q.  And she was worked in the office at
6  Times Square; correct -- I mean at Navillus?
7    A.  Correct.
8    Q.  Did she do work sending out drawings
9  and taking care of bids and so forth, when she
10 worked at Navillus?
11   A.  No.
12   Q.  Anyone else who was a Navillus
13 employee who went to Times Square?
14   A.  Trying to remember now. We had a site
15 safety manager, Wayne Murphy.
16   Q.  He was site safety manager at Navillus
17 before; right?
18   A.  Yes.
19   Q.  When did he come over?
20   A.  I believe June, 2007.
21   Q.  Why did he go from Navillus to Times
22 Square in June, 2007?
23   A.  Times Square is aggressively looking
24 for site safety managers, very tough to get. So
25 Fergal was involved in convincing him to work with

Page 27

1      K. O'Sullivan
2  Times Square.
3    Q.  He had, he being Wayne Murphy, had
4  served as a site safety manager at the Eighth
5  Avenue job before June, 2006; right?
6    A.  Yes.
7    Q.  He was a site safety manager employed
8  by Navillus at Eighth Avenue before --
9    A.  Correct.
10   Q.  Did you speak with your brother about
11 Wayne Murphy coming over?
12   A.  No.
13   Q.  Did you speak with Wayne about coming
14 over?
15   A.  No.
16   Q.  So it was Fergal who spoke with him?
17   A.  Fergal.
18   Q.  Any other employees come over?
19   A.  Just think --
20   Q.  Kieran Power?
21   A.  No, he was always -- wait a second --
22 let me see now -- yes, possibly he was with
23 Navillus at the beginning, short period of time.
24   Q.  When did he come to work for Times
25 Square?

Page 28

1      K. O'Sullivan
2    A.  I should check if he was at Navillus,
3  I couldn't be sure now that he was on Navillus's
4  payroll.
5    Q.  Are you looking at a document?
6    A.  Yes.
7    Q.  That's the payroll?
8        MR. PETERSON: Is that the payroll
9    produced to us?
10       MS. PITTAWAY: No, that's the form, I
11   gave you every week for the entire period of
12   time.
13       MR. PETERSON: There is also some
14   unredacted, I know, that that's fine that
15   you redact the certain information.
16       MS. PITTAWAY: I redacted the amounts
17   as well as home addresses.
18       MR. PETERSON: Yes.
19   A.  I couldn't be sure of the hiring date
20 now.
21       MS. PITTAWAY: That actually may very
22   well be the ADP payroll I gave you. I gave
23   you two different types of payroll.
24       MR. PETERSON: Possible, could you
25   take a quick look, I think that's right.

Page 33

1  K. O'Sullivan
2  not have it if the workers made the
3  contributions. I would speculate if they
4  did, these were pursuant to payroll
5  deductions, but they may not have been, so
6  I'll also ask Navillus this question.
7      MS. PITTAWAY: I was wondering if
8  there was something not redacted that is on
9  the payroll you already have.
10      MR. PETERSON: That won't tell you
11  where any deduction for any 401-K-type plan
12  was sent.
13      MS. PITTAWAY: I'll figure it out and
14  send it to you.
15   Q.  When you were working at -- when Times
16  Square's offices were at Long Island City, in the
17  Navillus offices as you have talked about, who did
18  the -- answered the phone and did the other
19  routine clerical work for Times Square?
20   A.  Thea Clark.
21   Q.  At this point you don't know whether
22  she was employed by Navillus or Times Square when
23  they did that work for Times Square?
24   A.  Would she answer the phone for Times
25  Square?

Page 34

1  K. O'Sullivan
2   Q.  Yes.
3   A.  I would imagine if she was at Times
4  Square.
5   Q.  When these, do you know how much these
6  employees, when I say these employees I'll go back
7  to the list, Fergal, Tony, Thea, Wayne and Lenny,
8  do you know if their salaries changed, their rates
9  of compensation changed when they went from
10  Navillus to Times Square?
11   A.  I would have made it more attractive,
12  yes.
13   Q.  You would have done what?
14   A.  I would have made it more attractive
15  for them to come to Times Square, yes.
16   Q.  So you increased their pay?
17   A.  Yes.
18   Q.  Do you remember how much you increased
19  their pay, on an individual basis?
20   A.  I don't.
21   Q.  Since September, 2006, have you
22  performed any services on behalf of Navillus?
23   A.  What do you mean by services?
24   Q.  I mean really anything at all,
25  answering phone calls, making phone calls, writing

Page 35

1  K. O'Sullivan
2  letters, signing documents, solving problems?
3   A.  Writing letters, documents, signing
4  anything, no, absolutely nothing. Would somebody
5  call me from another company being I had a
6  relationship with them, yes.
7   Q.  Can you remember specific instances of
8  people from other companies calling you about
9  Navillus?
10   A.  I remember one company, because we did
11  lot of work for them, was Lear Construction.
12   Q.  Who at Lear called you?
13   A.  You'll have people from, you know,
14  like project managers, to estimators. When I
15  worked with Navillus, that was my account, Donal
16  had nothing to do with them. So I was the only
17  person that they knew at Navillus, so when I had
18  shifted, when I resigned from Navillus and went,
19  started with Times Square, they were lost, they
20  knew the guy, you know, that was appointed there,
21  but they didn't, he didn't have the relationship
22  that I had with Lear for ten years. So whatever,
23  so they would come to me and ask me and I would
24  say I would tell them I'm not with Navillus any
25  more, but I would maybe call Navillus and say call

Page 36

1  K. O'Sullivan
2  this person and talk that out or whatever.
3   Q.  What kind of problems did the Lear
4  people call you with or issues, I call it
5  problems, but what would they call you about?
6   A.  Schedule of a job, problem on the job.
7   Q.  What kind of problem?
8   A.  Schedule, if they wanted to move a
9  schedule up by two, three weeks to get a job
10  finished or something like that, manpower
11  schedule -- not specifically manpower, but a
12  schedule of a project, if they wanted it
13  completed, if they wanted to expedite it or stuff
14  like that.
15   Q.  Then would you talk to people at
16  Navillus?
17   A.  I would tell Lear that I'm nothing to
18  do with it, that I would reach out and I would
19  have Navillus call, sort it out.
20   Q.  Who would you call at Navillus to sort
21  it out?
22   A.  I would call Mack McCormack.
23   Q.  About how many different jobs did Lear
24  people call you on after -- about how many
25  different Navillus jobs did Lear people call you

9 (Pages 33 to 36)

Page 37

```
 1           K. O'Sullivan
 2   after September, '06?
 3       A.  At the beginning it was maybe -- how
 4   many different individuals from Lear, is it?
 5       Q.  No, how many different jobs?
 6       A.  Oh, I can't remember, maybe two jobs,
 7   three jobs.
 8       Q.  How many individuals from Lear called?
 9       A.  Two, three people possibly.
10       Q.  That continued into 2007; right?
11       A.  Very minimal, once they were aware
12   that I was not handling the projects, I didn't
13   have anything to do with them any more, it just
14   quieted down.
15       Q.  Lear people called you with regard to
16   the Chatman School job; correct?
17       A.  It is quite possible, I don't even
18   know the job.
19       Q.  Do you remember David Hagerty from
20   Lear contacting you?
21       A.  David Hagerty?
22       Q.  Yes, excuse me, that's wrong, that's
23   an IT person: See, I told you I'm not Perry
24   Mason. Do you remember Anthony Iandoli from Lear?
25       A.  I know Anthony, yes.
```

Page 38

```
 1           K. O'Sullivan
 2       Q.  Do you remember him contacting you
 3   about the Chatman School?
 4       A.  I don't.
 5       Q.  What about your brother, Donal's
 6   involvement in Times Square, what work has he
 7   done, when I say work, I'm speaking very broadly
 8   again, phone calls, signing documents, attending
 9   meetings, whatever, what kinds of things has he
10   done for Times Square?
11       A.  On a day-to-day basis, nothing.
12   Locating new projects or new development sites,
13   you know.
14       Q.  Could you expand a little when you say
15   he looks at new projects and development sites?
16       A.  I'm the one who would be sourcing the
17   new project if I came, like a particular project,
18   as to Donal, I would ask him what would his
19   thoughts be, or would he invest as a developer.
20       Q.  So you would be doing the legwork, but
21   if something appealed to you, you and he would
22   make a decision together about whether to get into
23   that project; right?
24       A.  I would ask his opinion, what he would
25   think, but he would refer it back to me, being
```

Page 39

```
 1           K. O'Sullivan
 2   that I have done all the work, legwork, he would
 3   refer it back, whatever, to what I would feel
 4   would probably make the decision.
 5       Q.  Would he go to look at the sites and
 6   look at --
 7       A.  I would tell him about them. Whether
 8   he goes is another thing.
 9       Q.  Do you know if he has looked at
10   paperwork in connection with other -- with any
11   development sites, you know, bid documents, cost
12   estimates, plans, anything along those lines?
13       A.  I would, you know, we would produce --
14   you know, cost of land versus the -- cost of
15   whatever -- construction would build it for, and
16   you know, the development portion, what we would
17   put into profit on the development.
18       Q.  And he would review that information?
19       A.  Yes, he would look at it, whether he
20   would review it is another thing.
21       Q.  I guess he has 50 percent of the
22   ownership interests, would you guess that he would
23   probably take a look?
24       A.  You do what you can do. I give it to
25   him, and how much time he spends reviewing it, I
```

Page 40

```
 1           K. O'Sullivan
 2   don't know.
 3       Q.  Is that the process that you followed
 4   in the 34th Street job, that you produced
 5   documents that were cost estimates and so forth
 6   and he reviewed it, or you asked him to review it?
 7       A.  It would be -- yes, it would be
 8   similar, yes, we would do a pro forma thing,
 9   document, you know, showing cost of land, hard
10   costs, soft costs, put into a profit.
11       Q.  To get the financing for a project,
12   would you and he go to the potential sources of
13   financing together?
14       A.  At the beginning, he probably -- would
15   he attend some financial meetings -- well, let's
16   put it this way: We would all attend, all the
17   partners, whoever would be around, the owners, for
18   instance Eighth Avenue, 785 Partners, we source it
19   together.
20       Q.  So in that case you would be speaking
21   about you, your brother, Jay Eisenstat and David
22   Scharf?
23       A.  Yes. Now, he won't attend any of
24   those.
25       Q.  Do you know if he did in connection
```

10 (Pages 37 to 40)

TRISTAR COURT REPORTING SERVICE INC.                (212) 922-9144

Page 41

1  K. O'Sullivan
2  with 34th Street?
3  A. If he did, there were minimal, I would
4  attend most of them. But I'm not even sure if he
5  attended any of them.
6  Q. It was actually Navillus that prepared
7  the cost estimates on the Eighth Avenue job;
8  right?
9  A. At the beginning, they were putting,
10 they were -- Tony Del Greco were putting the
11 numbers together.
12 Q. And he was a Navillus employee at the
13 time?
14 A. Before he came with Times Square, yes.
15 Q. When you had the financing meetings
16 with the potential sources of money for the Eighth
17 Avenue job, you presented Navillus's cost
18 estimates to those sources of funding; right?
19 A. To the financial people?
20 Q. Yes.
21 A. No, we -- well, we would do a pro
22 forma, we would do an estimate with all the
23 different trades of -- to get to a GMP number.
24 Q. That was the document that was
25 prepared by Navillus; right, in connection with

Page 42

1  K. O'Sullivan
2  Eighth Avenue?
3  A. It was prepared for -- was it
4  specifically Navillus, I don't understand your
5  question.
6  Q. All right. Let me show you a document
7  that was an exhibit in the previous deposition?
8       MR. PETERSON: I think we can remark
9   it, this document was marked as Exhibit 1 in
10  the Donal O'Sullivan deposition, but maybe
11  we could mark it as Exhibit 2 in the Kevin
12  O'Sullivan deposition.
13      (K. O'Sullivan Exhibit 2, conceptual
14  estimate summary, marked for identification,
15  as of this date.)
16 Q. That's the conceptual estimate summary
17 done by Navillus in connection with the Eighth
18 Avenue job; right?
19 A. Budget numbers.
20 Q. That's a document that you would have
21 presented to potential sources of financing for
22 the development; correct?
23 A. If this is the actual document, I
24 don't know.
25 Q. Take a look a little more. It was

Page 43

1  K. O'Sullivan
2  produced to us in discovery, so --
3  A. But if this is the actual document
4  that was produced, the financial people, I don't
5  know.
6  Q. Why did you ask Tony Del Greco to come
7  to work for Times Square?
8  A. I was building my team.
9  Q. Why him in particular?
10 A. Tony had his background knowledge with
11 big developers who did work.
12 Q. And he had prepared this cost estimate
13 on the Eighth Avenue job; right?
14 A. Yes.
15 Q. So he worked, continued to work on the
16 Eighth Avenue work after he came to work for Times
17 Square; right?
18 A. He continued to work with Eighth
19 Avenue, for Times Square, yes.
20 Q. Who made the decisions about which
21 subcontractors would be hired at the Eighth Avenue
22 job?
23 A. That would be my decision.
24 Q. Is the same true with respect to the
25 34th Street job?

Page 44

1  K. O'Sullivan
2  A. Yes.
3  Q. What company got the subcontract to do
4  the concrete work at Eighth Avenue?
5  A. Navillus.
6  Q. How about the foundation work?
7  A. Russo did the excavation, Navillus did
8  the concrete.
9  Q. What about the masonry?
10 A. Navillus.
11 Q. What about the superstructure
12 concrete?
13 A. Navillus.
14 Q. Did you request, did you, in this
15 case, speaking about Times Square, did Times
16 Square request bids from various subcontractors
17 with respect to the Eighth Avenue job?
18 A. Did we source for bids?
19 Q. Yes.
20 A. For Eighth Avenue?
21 Q. Yes.
22 A. Yes.
23 Q. Did you source for bids for the
24 concrete, masonry or superstructure concrete?
25 A. We didn't for the foundation or

11 (Pages 41 to 44)

TRISTAR COURT REPORTING SERVICE INC.                                (212) 922-9144

Page 49

```
 1              K. O'Sullivan
 2   would consider ourselves on this one.
 3       Q.   So what is the financial, I'm not
 4   asking for dollars, but what is the structure of
 5   the financial arrangement between Times Square and
 6   the owners of the property, is that a flat fee or
 7   is it also a cost plus?
 8       A.   The contract is a GMP, it is they
 9   benefit on the savings, if we can buy trades out
10   cheaper.
11       Q.   They being the owner?
12       A.   Owners.
13       Q.   I guess --
14       A.   We are, being an owner.
15       Q.   Well, you own part of the property,
16   you own part of the construction manager, you own
17   part of the sub.
18       A.   Yes -- well, no, when I say that is at
19   785 Partners that would be, and I would be 25
20   percent owner, so I would benefit as well?
21       Q.   What are the initials GMP?
22       A.   Gross maximum price.
23       Q.   Did you check with anyone outside of
24   Times Square, did you ask any of the owners
25   whether it was okay to hire Navillus?
```

Page 50

```
 1              K. O'Sullivan
 2       A.   They would want Navillus.
 3       Q.   Why?
 4       A.   To do the -- being as I said, being
 5   that we didn't have a proper set of documents,
 6   they were nervous themselves that they would get
 7   taken for a ride themselves.
 8       Q.   Why not go with some other concrete
 9   sub on a cost plus basis, why go with Navillus?
10       A.   Because Navillus they felt if Navillus
11   was the owners, were part of the development, that
12   they wouldn't, it would be fair, they wouldn't
13   screw each other, excuse my language, and they
14   knew that, you know, being that the -- one of the
15   owners of or the owners of the project was
16   performing the work, that it was in their best
17   intentions that the work would be performed and
18   done as aggressively as possible and get the job
19   done, and they wouldn't get held up.
20       Q.   You spoke with your other partners
21   about that and that's what they told you?
22       A.   Oh, yes.
23       Q.   And you felt the same way?
24       A.   Absolutely.
25       Q.   And your brother felt the same way?
```

Page 51

```
 1              K. O'Sullivan
 2       A.   Navillus felt very comfortable with it
 3   as well, because Donal at that time was building
 4   his foundation -- his portion of Navillus
 5   foundations and superstructure, so he was trying
 6   to build a portfolio for himself.  Navillus
 7   performs all this work and so on, so it was to his
 8   benefit as well.  He wasn't making as much money
 9   out of it, but he wasn't getting hurt either.
10       Q.   Why was he not making as much money?
11       A.   You know, if you had a proper set of
12   documents, you know, you could -- it depends on
13   the market; right now if you look at
14   superstructure concrete guys it is crazy, they
15   are -- the price has gone nuts because they can
16   pick and choose what they want, because there are
17   not enough superstructure concrete to do the work.
18       Q.   They can make more than 10 percent
19   profit?
20       A.   They can, absolutely.  They wouldn't
21   do it, you won't get a contractor to do it for 10
22   percent now.
23       Q.   What is the typical margin?
24       A.   Well, I have to ask superstructure
25   guys that, but I would say it is well above 20
```

Page 52

```
 1              K. O'Sullivan
 2   percent, I guess it depends how they feel that
 3   day, what margin, because they have the comfort of
 4   picking and choosing their work, not like before.
 5       Q.   At 34th Street, does Navillus also
 6   have a cost plus contract?
 7       A.   No.
 8       Q.   Why?
 9       A.   Times Square is contracted different
10   in 34th Street we have a lump sum contract at 34th
11   Street, and there is no extra, there is no credit,
12   that's the way Times Square -- that I wanted to
13   build the job.
14       Q.   When was the decision made to go with
15   Navillus at Eighth Avenue?
16       A.   At the very early stages.
17       Q.   Sometime early '06?
18       A.   I would think so, it was at the very
19   beginning, being when we originally spoke with our
20   partners on this job it was 29 stories.  Then we
21   had it increased to 43, so we wanted to -- the
22   most dangerous part we knew would probably be the
23   foundation superstructure.
24       Q.   When you say that, you are talking
25   about financially dangerous?
```

Page 53

K. O'Sullivan

A. Riskiest part, foundation, superstructure, any developer would tell you that's the most risky part of the job, once you get your superstructure -- once you are out of the hole and doing superstructure that's different.

Q. So the decision was made to go with Navillus on this cost plus basis sometime early '06?

A. I can't specifically tell you it was at the very early stages, yes.

Q. It was still when you were an officer of Navillus?

A. Yes. If I remember correctly, I think our partners, Dave Scharf and Jay Eisenstat, they wanted that, they insisted that that would be part of the deal.

Q. Did they say why they insisted that be part of the deal?

A. They wanted protection.

Q. For the reasons you talked about earlier?

A. Correct.

(Discussion off the record.)
(Recess taken.)

Page 54

K. O'Sullivan

Q. Let me ask you a couple of questions about Nick Albanese. Let me take a step or two back as a way of getting into that issue.

At some point in early mid this year, I guess, you were up out of the ground; right?

A. Yes.

Q. At that point, what kind of work was Times Square performing at the job site? I know that's a very broad question, but I'm focusing really on the employees of Times Square, not necessarily the subs. You had a project manager on the job; right?

A. Correct.

Q. That was Gabriel?

A. Fergal.

Q. Fergal was project manager. What other employees of Times Square were at Eighth Avenue in let's call it May of '07?

A. Our super, Lenny Kelly -- Times Square employees?

Q. Yes.

A. Okay, Lenny Kelly, in May --

Q. '07, this year.

A. We may have John McAdams, he would be

Page 55

K. O'Sullivan
our MEP coordinate.

Q. MEP stands for?

A. Mechanical trades.

Q. Okay.

A. Project manager -- in May, I don't think -- actually on the job.

Q. Yes.

A. Or involved in the job?

Q. I was talking about at the job site.

A. At the job site. I can't even remember what -- when Albanese came on the job. It probably was sometime May or June, I think, but I don't know the exact date.

Q. Where was Gabriel working?

A. Gabriel is the labor coordinator for Navillus.

Q. As far as you know, he was at the job site; right?

A. Not for then, no, he would be handling all, I would imagine, a lot of Navillus's projects.

Q. Who from Navillus other than the hourly construction workers would have been at the job site in May? I'm not trying to hold you to

Page 56

K. O'Sullivan
the exact date, but that period of time. Once you were up out of the ground, but right after that, do you know who from Navillus would have been working at the job site?

A. Navillus would have their work crew, foremen, shop stewards, supers, they would have their -- you know, project manager would be coming and going.

Q. Do you know who the project manager was for Navillus?

A. Sean Coffey.

Q. Okay. Are you familiar --

A. Two actually, I don't know if Gerry Cormican was involved too.

Q. Did they do basically the same job, Sean and Gerry, as far as you know?

A. I think it was a transition period, I think Gerry was the PM and then they went to Sean, or vice versa, I'm not quite sure.

Q. Are you familiar with the term general conditions, you know, as used by laborers?

A. Yes.

Q. General conditions work?

A. Yes.

14 (Pages 53 to 56)

TRISTAR COURT REPORTING SERVICE INC.                            (212) 922-9144

Page 65

K. O'Sullivan

them that time because, you know, we needed something more, being that it was early stages, and that wouldn't have been enough work for a Local 79 guy, that he would come -- have a site safety license. So based on if they fulfilled those requests, and I decided yes, sure, that's fine.

Q. So you are saying at that stage, because the project hadn't advanced, there really wasn't work for a 79 guy?

A. I guess we weren't obliged to hire a clean up laborer, you know, I had Fergal, an assistant, there at the time.

MR. COHEN: You mean Fergal Cronan.

THE WITNESS: Fergal Cronan, he was performing any stuff Times Square wanted at that point. Did we need another 79, another employee, or 79, or whoever may be on the job for cleanup, no.

Q. Okay. You thought a site safety supervisor would be useful?

A. I thought, you know, as I said, being my prior relationship being with Navillus for so long and being the Navillus has with Local 79 and

Page 66

K. O'Sullivan

just to keep peace rather than -- I says guys, fine, give us a guy that will work, and give us a guy that who has a site safety license so we could keep him. If the guy turned out good and was a good guy and wanted to work, you know, that would be full-time work for him.

Q. As a site safety?

A. As whatever, he came on as a 79 laborer and sure, I mean if the guy proven to be committed and wanted to -- really wanted to do, you know, cared about the job, you know, possibly down the road we could have hired him as a full-time Times Square person.

Q. At this point in time, was Wayne Murphy still working for Navillus?

A. Yes, I believe so, yes.

Q. So did Times Square, as the construction manager or GC, need its own site safety supervisor?

A. We were recruiting, Times Square is a young company, so we are recruiting, trying to recruit good people, get good people in, so we were aggressively looking for site safety people.

Q. Well, just in general, if you had one

Page 67

K. O'Sullivan

or not, did you feel you needed an actual Times Square site safety supervisor at that point in the job, at Eighth Avenue?

A. Well, at that point it was being performed Navillus had Wayne Murphy on site.

Q. Isn't it usually the GC who has a site safety supervisor?

A. As I said, you buy as much as you can in a contract, you know.

Q. Was that part of the contract with Navillus, that they have a site safety supervisor?

A. It was a requirement part of the discussions that time that they would have a site safety person.

Q. Is that, was that written into the contract?

A. Not sure if it was written or not, no.

Q. So what do you mean by the discussion?

A. I mean as I said, Times Square was a young company, Navillus was the first one on the job, we didn't have a site safety person, and at the beginning we asked Navillus to supply their site safety guys on the project.

Q. The way that was arranged, it would be

Page 68

K. O'Sullivan

the same as -- financially be the same as having a Times Square person plus 10 percent, is that a fair statement, because it was a cost plus contract?

A. Cost plus, yes. It was more I guess because at the beginning we didn't have one at Times Square. Could we have got one in time, we probably couldn't. So rather than -- we needed to start the project, we need to start the project so Navillus -- they would have, I imagine, a good few site safety people on their staff.

Q. Currently the site safety person is a Times Square person?

A. Right now, yes.

Q. And that's Wayne, or is Wayne still at Eighth Avenue --

A. Yes, Wayne Murphy.

Q. Let me talk to you a little more about your conversations. Who -- I know you mentioned you spoke with Fergal Conefrey. Who else did you talk with about hiring a 79 guy on?

A. Who was -- what do you mean who --

Q. In any connection, in other words, you knew that 79 was asking for a guy on?

17 (Pages 65 to 68)

TRISTAR COURT REPORTING SERVICE INC.                    (212) 922-9144

Page 73

1    K. O'Sullivan
2  knowledge, maybe a week or two.
3    Q. So I think it is already established
4  that you didn't -- that Nick was not put on the
5  Times Square payroll; right?
6    A. We can't pay him, we wouldn't have a
7  problem paying him, we don't have that problem,
8  but his representation in the union won't allow us
9  to pay him.
10    Q. In other words, the union benefit fund
11  wouldn't accept a check from Times Square; right?
12    A. Be it the benefit fund, or be it his
13  delegate.
14    Q. If it weren't for that, would you have
15  put him on as a Times Square -- on the Times
16  Square payroll?
17    A. Yes. Make a lot more sense for us.
18    Q. Have you, before Nick Albanese at the
19  Eighth Avenue job, have you been involved in
20  paymaster arrangements? In other words, not
21  necessarily you personally, but are you familiar
22  with Navillus, or Times Square, or anyone --
23    A. I'm familiar with Navillus, yes.
24    Q. Navillus has done paymastering before?
25    A. Yes.

Page 74

1    K. O'Sullivan
2    Q. And were you personally involved in
3  those paymaster circumstances in the past?
4    A. In one particular project, it was
5  Brooklyn Children's Museum, the project and the
6  general contractor was Skanska, they are one of
7  the biggest GCs around. So they were performing
8  work on the Brooklyn Children's Museum. I,
9  Navillus, when I worked for Navillus, we were
10  responsible for the tile work. Their super or
11  project manager had asked me they need to add a 79
12  laborer, would I do a paymaster. I said fine.
13    Q. About how long ago was that?
14    A. 2005.
15    Q. Skanska was the GC?
16    A. They were construction managers or GC,
17  I'm not sure how that contract read with the
18  owner.
19    Q. Neither you nor your brother had any
20  ownership interest in Brooklyn Children's Museum
21  or Skanska; right?
22    A. No.
23    Q. How did Navillus come to be selected
24  as paymaster for Nick Albanese?
25    A. At the time it seemed that Navillus

Page 75

1    K. O'Sullivan
2  were our sub on the job, that it seemed the
3  easiest path at that time to make them the
4  paymaster.
5    Q. Who did you speak with about making
6  Navillus paymaster?
7    A. I believe I let Fergal handled that.
8    Q. Did he tell you who he talked with?
9    A. He didn't, no.
10    Q. But you were okay with Navillus being
11  paymaster?
12    A. That was fine with me. I would have
13  preferred if I could have paid him myself, but I
14  didn't have that luxury.
15    Q. There came a point in time where
16  Navillus was no longer the paymaster; right?
17    A. Yes.
18    Q. Do you know how that happened? Did
19  you hear anything about the circumstances?
20    A. Yes, Navillus came to Fergal and says
21  guys, deal with your own headaches, Local 79 are
22  tormenting you, we don't want to be your
23  paymaster, and then it was at the time when Nick
24  wasn't performing his daily duties that he was
25  hired to do.

Page 76

1    K. O'Sullivan
2    Q. In what way was 79 tormenting Navillus
3  about that?
4    A. Times Square were -- I had spoken to
5  Brosnan and Fergal had spoken to the local
6  representation that we needed a replacement, and
7  they refused to give us a replacement.
8    Q. Did Fergal say what he meant by
9  tormenting?
10    A. They kept calling Gabriel, they kept
11  annoying Gabriel and I believe they kept annoying
12  Donal as well.
13    Q. Why would they be calling if Nick was
14  already on the job?
15    A. It was a time that Nick, there was a
16  dispute where Nick wouldn't do his job, and Times
17  Square wanted a replacement.
18    Q. Did Times Square replace him?
19    A. They wouldn't give us a replacement.
20  We asked for a replacement, we said this guy will
21  not perform his daily duties, is what he would
22  come to work, he would stand up at the gate, and
23  first -- actually the first time Fergal was
24  telling me came on site, he says not to -- did he
25  ask where should I work or what should I do, but

19 (Pages 73 to 76)

Page 97

1 K. O'Sullivan
2 operating out of Navillus's office?
3 A. Yes, we were using, did we use some
4 Navillus stationery, I -- it is quite possible,
5 yes.
6 Q. But it wasn't Navillus that was
7 putting together the budget?
8 A. Oh God, no.
9 Q. This came out of the Navillus computer
10 you were using?
11 A. Yes, came out of the Navillus computer
12 but it is Times Square.
13 MR. COHEN: That's all the questions I
14 have.
15 FURTHER EXAMINATION
16 BY MR. PETERSON:
17 Q. To follow up, are you saying that Tony
18 Del Greco, I thought you said Tony Del Greco was a
19 Navillus employee at the time?
20 A. He was working with Navillus, yes.
21 Q. When you handed this document out, did
22 you explain to people that even though it said
23 Navillus it wasn't -- Navillus, it was just --
24 letterhead?
25 A. Oh God yes, the financial people are

Page 98

1 K. O'Sullivan
2 well aware Navillus is not the GC, nothing to do
3 with the job.
4 Q. Look at the date on that, February,
5 2006?
6 A. Yes.
7 Q. Was Navillus the GC already?
8 A. God, no.
9 Q. Was Times Square already the GC?
10 A. Times Square the GC on the project at
11 2/28/06, that is very much around the same time
12 that Times Square was, but to be -- the financing
13 was secured with Times Square, not with Navillus,
14 Navillus were never going to be a general
15 contractor on the job.
16 Q. But the document said Navillus?
17 A. The printout here says Navillus, yes,
18 but absolutely not.
19 Q. Do you know how the word Navillus gets
20 on the computer document?
21 A. I'm not a computer guy to be honest
22 with you, but the way the systems are set up I
23 would imagine it printed out like that.
24 Q. So somebody couldn't go into the
25 computer and type Times Square instead of

Page 99

1 K. O'Sullivan
2 Navillus?
3 A. I'm sure they could. Why wasn't it
4 done? You know, the programs were all -- I don't
5 know, I don't know, you know, that's the way the
6 computer kicked it out, but I just want to be
7 clear about it, that Navillus under no
8 circumstances were going to be the general
9 contractor on the job.
10 Q. Navillus is Sullivan spelled
11 backwards; right?
12 A. That's not their work anyway, they
13 are -- Navillus are subcontractors.
14 Q. Are you aware Navillus has been a
15 general contractor on other jobs?
16 A. Only work that they can self-perform
17 70, 80 percent, not new construction, it is just
18 renovation.
19 Q. And Navillus is Sullivan, spelled
20 backwards; right?
21 A. Yes.
22 Q. That's how you guys came up with that?
23 A. Yes.
24 Q. So you had a bunch of d/b/as with
25 Navillus?

Page 100

1 K. O'Sullivan
2 A. Yes.
3 Q. Over the years?
4 A. Oh, yes, I don't know how many, but we
5 have had d/b/as.
6 Q. And Navillus is in the concrete
7 business; isn't it?
8 A. But Navillus are new to the foundation
9 and super structure, they are in the business --
10 couple of years.
11 Q. Long enough for the owners of the
12 Eighth Avenue project to feel confident that
13 Navillus could do a good job?
14 (Continued on next page.)
15 o0o
16
17
18
19
20
21
22
23
24
25

Page 101

1  K. O'Sullivan
2  A. Yes, because Navillus had just
3  completed, 2005, that building on 35th Street a
4  superstructure building, that was I guess the
5  first real building Navillus did the
6  superstructure in.
7      MR. PETERSON: Thank you.
8      MR. COHEN: Off the record.
9      (Discussion off the record.)
10     (Time Noted: 12:51 p.m.)
11
12
13         KEVIN O'SULLIVAN
14
15 Subscribed and sworn to before me
16 this      day of       , 2007.
17
18
19 (Notary Public)    My Commission Expires:
20
21
22
23
24
25

Page 102

1
2         C E R T I F I C A T E
3  STATE OF NEW YORK   )
                       : ss.
4  COUNTY OF NEW YORK  )
5      I, JOHN IANNO, JR., a Shorthand
6  Reporter and a Notary Public within and for the
7  State of New York, do hereby certify that the
8  foregoing deposition of KEVIN O'SULLIVAN was taken
9  before me on the 26th day of October, 2007;
10     That the said witness was duly sworn
11 before the commencement of his testimony; that the
12 said testimony was taken stenographically by me
13 and then transcribed.
14     I further certify that I am not
15 related by blood or marriage to any of the parties
16 to this action or interested directly or
17 indirectly in the matter in controversy; nor am I
18 in the employ of any of the counsel in this
19 action.
20     IN WITNESS WHEREOF, I have hereunto
21 set my hand this 2nd day of November, 2007.
22
23
24         JOHN IANNO, JR.
25

Page 103

1
2  October 26, 2007
3         I N D E X
4  WITNESS         EXAMINATION BY      PAGE
5  KEVIN O'SULLIVAN   MR. PETERSON     4, 97
6      MR. COHEN          95
7  ---------- INFORMATION REQUESTS ----------
8  DIRECTIONS (DI):   None
9  INSERT:            None
10 RULINGS (RL):      None
11 REQUESTS (RQ):     32
12 CERTIFIED (CE):    None
13 MOTIONS (MO):      None
14        E X H I B I T S
15 K. O'Sullivan Exhibits          For ID
16 1-A, document is headed New York
17    State Department of State,
18    Division of Corporations,
19    Entity Information           14
20 1-B, document is headed New York
21    State Department of State,
22    Division of Corporations,
23    Entity Information           14
24 2, conceptual estimate summary     42
25 3, a copy of two E-mails           71