# Exhibit B

D. O'Sullivan

A. I'm the president.
Q. How long have you been the president?
A. Since its beginning.
Q. Which is when?
A. '87.
Q. Are you also a -- do you have an ownership interest in Navillus?
A. I do.
Q. What percentage?
A. 50.
Q. Is there one person that has the other 50?
A. That's correct.
Q. Who is that?
A. Kevin O'Sullivan.
Q. Have you each been 50-50 owners since 1987?
A. No.
Q. When did that start, when you each owned half?
A. Approximately 1999.
Q. I understand Kevin resigned as an officer at some point last year, but before that, what office did he hold in the company?

D. O'Sullivan

MR. STURM: Objection to form.
A. Vice president.
MR. STURM: Can we go off the record?
MR. PETERSON: Yes.
(Discussion off the record.)
MR. STURM: During the off-the-record discussion the parties agreed to a stipulation concerning waiver of objections concerning form, the parties stipulate that all objections as to form are preserved, and therefore we hope that the deposition will go quicker.
Q. When you both were officers of -- first, when did Kevin cease being an officer of Navillus?
A. Middle of last year, I'm not sure of the date.
Q. Before that time, when you were both still officers, were there any other officers of Navillus? In other words, you were president, he was vice president, was there anyone else who held an office at Navillus?
A. There may be a director for scaffold.
Q. Director for scaffold?

D. O'Sullivan

A. Can I --
Q. If you don't know --
A. Yes, I don't know.
Q. Who would that individual be, even if you are not sure that he or she held that actual office?
A. Not an office, it would be a director.
Q. A director. Who is that person?
A. I can't remember the name, it is just recently.
Q. When Kevin was the vice president and you were the president, what functions and duties did Kevin perform at Navillus?
A. He maybe looked after the tile and stone division of Navillus.
Q. What about you, what did you look after?
A. Everybody was answerable to me.
Q. Including Kevin?
A. Excluding Kevin.
Q. Did he participate in decisions about matters that were outside the tile and stone division also?
A. Yes.

D. O'Sullivan

Q. Other than tile and stone, what was Navillus doing at the time? What kinds of jobs, what kind of work?
A. Concrete work, masonry work, for the most part.
Q. Who was responsible for overseeing that?
A. I was.
Q. Do you have any interest in Times Square Construction?
A. Yes.
Q. What is your interest in Times Square?
A. I'm an owner.
Q. What percentage?
A. 50 percent.
Q. Does Kevin own the other 50 percent?
A. That's correct.
Q. When was Times Square Construction created?
A. Again, approximately the early part of 2006.
Q. Have you and Kevin been co-owners since then?
A. Yes.

D. O'Sullivan

Q. Has anyone else had an ownership interest in Times Square other than the two of you?

A. No.

Q. Do you hold an office in Times Square?

A. No.

Q. Do you know why Kevin resigned his office at Navillus?

A. No.

Q. Did he say anything to you about why he was resigning?

A. We talked about getting into development some while back. We agreed after looking at some properties, we agreed that he would, Kevin would run that division, I would run the Navillus division.

Q. You mentioned division. Division --

A. Put another word, that company, or...

Q. There is also an entity called Eighth and 48th Street Development Corp.?

A. Yes.

Q. What is the function of that company?

A. The owner -- part owners of the 785 project.

D. O'Sullivan

Q. 785 Eighth Avenue?

A. Building, yes.

Q. Do you have an interest in that entity, at Eighth and 48th?

A. Yes.

Q. What is your interest?

A. 50 percent owner.

Q. Is Kevin the other 50 percent owner?

A. Of Eighth and 48th, yes.

Q. When was that entity formed, speaking about Eighth and 48th?

A. I'm not sure.

Q. Was it before or after Times Square was set up?

A. I'm not sure.

Q. Do you have an office and do you hold an office in Eighth and 48th?

A. An office as in?

Q. As in being an officer of, not do you have a desk and chair. Are you president, vice president, director, anything along those lines?

A. I'm not sure to be honest, I'm not sure. Only two of us, I presume I do.

Q. Similarly because there is only two of

D. O'Sullivan

you, you presume is it true to say you presume Kevin holds an office in Eighth and 48th?

A. Again, I don't know.

Q. Do you know if anyone else is an officer of Eighth and 48th?

A. I wouldn't think so.

Q. You mentioned with respect to Navillus, you mentioned the tile division and also concrete and masonry. Since it was founded, has Navillus performed any other kind of work beside tile, concrete and masonry?

A. Trades that would be included, some carpentry, some plaster, obviously some welding if we came across it, anything associated with that work.

Q. That work being concrete, masonry --

A. Concrete, masonry work, tile work, plaster work, that type of work, carpentry work.

Q. Has Navillus functioned as the general contractor in any projects?

A. Yes.

Q. Can you give us an estimate of how many projects Navillus has functioned as a general contractor on?

D. O'Sullivan

A. Ten.

Q. Same question with respect to construction manager, has Navillus functioned as a construction manager on any of the projects?

A. No.

Q. Do you know the most -- approximately when the most recent project on which Navillus was a general contractor took place?

A. Not the most recent one, but most recent ones would be schools, a bunch of schools come together.

Q. Would that have been in the past year or two?

A. Yes.

Q. I'd like to ask you some questions about the Eighth Avenue job, 785 Eighth Avenue. When did Navillus first become involved in work at that address, 785 Eighth Avenue?

A. Again, approximately November, 2006, 2007.

Q. Did Navillus have anything to do with the demolition at that address?

A. No.

Q. Who is the owner of the job site?

Page 17

D. O'Sullivan

A. No.

Q. How is the name Times Square arrived at?

A. I have no idea.

Q. It doesn't have anything to do with the proximity of this job site to Times Square?

A. Your guess is as good as mine.

Q. Did you speak with your brother about that?

A. No.

Q. You are a 50 percent owner?

A. Correct.

Q. Did you have anything to do with the decision about the name of the company?

A. No, no.

Q. When did you and your brother decide to form Times Square?

A. Again, late 2005, early 2006, we decided to form a company to build projects on our own account.

Q. Did you, when doing that, did you and Kevin discuss what role Navillus would play in projects that Times Square would be building?

A. No.

Page 18

D. O'Sullivan

Q. How many projects has Times Square been involved in building?

A. Again, I just know of two.

Q. You are a 50 percent owner, is it possible they are building projects you are not aware of?

A. It is quite possible. I'm not involved in every day running of the company.

Q. The two are the Eighth Avenue project and a project on 34th Street; correct?

A. Correct.

Q. Navillus is performing work at both of those job sites; correct?

A. Correct.

Q. Now tell me what work Navillus is performing at Eighth Avenue.

A. Superstructure concrete, and masonry work.

Q. How about 34th Street, what work is Navillus performing there?

A. Superstructure concrete, and we are negotiating the masonry contract.

Q. You are negotiating what?

A. Masonry contract.

Page 19

D. O'Sullivan

Q. Who are you negotiating with, with respect to the masonry contract at 34th Street?

A. My project manager is negotiating with their project manager, I'm not sure who he is negotiating with, not sure what specific person there I'm negotiating with, the name of that person.

Q. You would be the person who would decide whether Navillus would do the work at the agreed upon pricing; correct?

A. Final decision would be mine.

Q. The final decision on Times Square's part would be Kevin's; correct?

A. I don't know.

Q. Have you talked with Kevin about the 34th Street project?

A. In what capacity?

Q. Any capacity?

A. Obviously we talked about we bought the property.

Q. So you are co-owners of that property also?

A. Yes.

Q. Do you own, you, that is to say, you

Page 20

D. O'Sullivan

or whatever entity holds title to the property, do you own a hundred percent of it, or a percentage of it?

A. A percentage of it.

Q. 50 percent?

A. No.

Q. What percent?

A. 30 percent, sorry, correction, you say you --

Q. I'll break it down. Did you form an entity to take an ownership interest in the 34th Street?

A. Yes.

Q. What is the name of that entity?

A. I don't know the exact name.

Q. Are you and your brother co-owners of it?

A. Yes.

Q. Do you and your brother each own half?

A. Yes.

Q. That entity, whatever the name of it is, is it that entity which owns 30 percent?

A. Correct.

Q. Who owns the other 70 percent?

Page 25

D. O'Sullivan

set the schedule.

Q. You were a member of the development team?

A. No, I'm not. There is -- let me be clear on this -- our partners have all the responsibility of the development team with reference to 785 or development duties I guess you would call it.

Q. What do you mean by development duties?

A. Requisitions, schedules, financing, those type things.

Q. Who decided that Navillus would do work at Eighth Avenue?

A. We were hired by Times Square.

Q. Who did you talk with about Navillus being hired to do work at Eighth Avenue?

A. I don't know if I actually talked to anyone. Again, I'm not sure, I don't get involved in a lot of details with jobs, it could very well be my project manager.

Q. Who is that?

A. For this particular job at the time was Gerry Cormican.

Page 26

D. O'Sullivan

Q. Did you speak with Gerry about the job?

A. Yes.

Q. What did he tell you about any conversations he had with Times Square about Navillus working -- getting the work at Eighth Avenue?

A. It is a broad question.

Q. Yes.

A. I talk to Gerry every day about jobs.

Q. I don't mean about the job, every aspect of the job. What did he tell you about his conversations with Times Square relating to Navillus getting the work in the first place?

A. That, I don't remember.

Q. Do you know when it was decided that Navillus would do work at Eighth Avenue?

A. Again, summer of 2006.

Q. You said that the reason for the cost plus contracts that Navillus had for Eighth Avenue was that the drawings were not complete. When, to your knowledge, were the drawings complete?

A. I didn't say that was the reason. I said I couldn't give a firm bid.

Page 27

D. O'Sullivan

Q. Okay.

A. On the project, without completed drawings.

Q. Do you know the reason why Times Square agreed to a cost plus contract then, if it wasn't the drawings?

A. I don't know, but I would presume you can't get a firm bid.

Q. I'd like to show you a document.

MR. PETERSON: I ask the court reporter to mark this as Donal O'Sullivan 1.

(D. O'Sullivan Exhibit 1, conceptual estimate summary, marked for identification, as of this date.)

Q. I'll let you take a look at it. For the record, the heading of this document is Navillus Contracting, 785 Eighth Avenue conceptual estimate summary, and it says printed, 2/28/2006?

MS. PITTAWAY: I believe that this is an incomplete document. I believe there was a contract attached to this.

MR. PETERSON: Documents were not produced to us in that form, just a big --

MS. PITTAWAY: I believe it is an

Page 28

D. O'Sullivan

incomplete document and there was a contract, but I'm just stating that for the record.

Q. This was a document prepared by Navillus contracting; correct?

MR. STURM: There may be a little confusion, this is not the document, because there are additions to this document in the documents in his files.

MR. PETERSON: Maybe you can elucidate. I'm not trying to be difficult. We got document production in the form of one big continuous set of documents, nothing was separated into --

MR. STURM: My perception is that the Bates number and the confidentiality status of it is listed on the bottom, which is not in the original document.

MR. PETERSON: All right.

MR. STURM: That's my assumption because it is not what I have.

MR. PETERSON: Fair enough.

Q. Other than the confidential and Times Square Bates number, is this a document produced

D. O'Sullivan

and prepared by Navillus?

A. Sorry.

MR. STURM: Can we consult, or --

MR. PETERSON: I would rather have the witness answer.

A. Okay, it was produced by an employee working with Navillus.

Q. Who is that?

A. At the time, Tony Del Greco.

Q. Tony Del Greco?

A. Yes.

Q. He was a --

A. Sorry, I should say I think it is Tony Del Greco.

Q. Tony Del Greco at the time was being paid by Navillus, though; is that right?

A. Tony Del Greco at the time was employed by Navillus, yes.

Q. When did Tony Del Greco cease being employed by Navillus and become employed by Times Square?

A. Don't know, sometime in 2006.

Q. Do you know why he ceased being employed by Navillus and started being employed by

D. O'Sullivan

Times Square?

A. Yes.

Q. Why?

A. Because he was the most knowledgeable person at the 785 Eighth Avenue project.

Q. How did he come -- sorry?

A. Kevin and I decided to get into development, we looked at many projects, this being one of them. Tony prepared the conceptual estimates for us.

Q. Us being Navillus?

A. No, us being Kevin and I.

Q. But at the time he prepared them, he was an Navillus employee; right?

A. At the time he prepared them, he was a Navillus employee. He may have been reimbursed for these conceptual estimates he put together for Kevin and I.

Q. I just want to make sure I understand that he went to work for Times Square because of the work that he did to prepare these conceptual estimates; is that right?

A. Correct.

Q. That meant he was the person that had

D. O'Sullivan

the most thorough understanding of the elements of the building project, is that a fair way to say it or would you say it a different way?

A. Putting the conceptual estimate together for the developer.

Q. So tell us what a conceptual estimate is and what its function is?

A. In a nutshell, how much profit you make at the end of the day.

Q. If I look at this document, it appears that this contains detailed estimates of the cost of various construction work to be performed at the site, not just concrete, but essentially all of the construction work at the site; is that right?

A. Yes.

Q. How long had Tony Del Greco been working at Navillus at this time? When I say this time, I mean February of 2006, just because that's the date on the document?

A. Can't be sure, he started in approximately February, 2004 or 2005, I'm not sure which year.

Q. Did you hire him?

D. O'Sullivan

A. Yes.

Q. Why did you hire him?

A. I hired him to run our agency work when it came to general contracting, in New Jersey.

Q. Did there come a time when you concluded that Tony would be useful to your development work as opposed to contracting work?

A. Yes.

Q. When about, when approximately was that?

A. Sometime in 2006, I would say.

Q. Did you speak with Kevin about that, when I say that, I mean your conclusion that Tony would be useful in the development end of the business?

A. Yes.

Q. I know this is a broad question, but can you say what you and Kevin discussed with respect to Tony's involvement in the development work?

A. He had the most knowledge and the best capability of dealing with banks, and zoning requirements, dealing with the 401-K attorneys,

D. O'Sullivan

A. Correct.

Q. Do you know why he went from Navillus to Times Square.

A. I don't know.

Q. Does Navillus have a safety inspector at the site now?

A. Yes.

Q. Who is that?

A. Patty, Patrick Corcoran.

Q. When did he start, approximately, if you know when he started as safety inspector for Navillus, at the site?

A. I guess again approximately March, April, 2007, generally when the superstructure started.

Q. What part of the project did Wayne Murphy cover, if you will, for Navillus?

A. Concrete work, foundation work.

Q. Wayne was a Local 79 member; correct?

A. When he worked for us in the past, he was a Local 79 member.

Q. Do you know why Wayne went from Navillus to Times Square?

A. I don't know.

D. O'Sullivan

Q. Were you involved in the decision pursuant to which Wayne went from Navillus to Times Square?

A. I can't remember, to be honest.

Q. Do you remember if your brother called and asked if Wayne could come to work for Times Square?

A. No.

Q. Do you know if Times Square had its own safety inspector before Wayne went to Times Square?

A. I don't think so, on that particular time, I don't know about any other times.

Q. I was talking about that particular time, thank you.

Is that unusual for a general contractor not to have a safety inspector at a job site?

A. No. We are performing a project at Jansen Housing at the moment, site safety guy is our employee, is an employee of ours, but the general contractor doesn't have one.

Q. You say ours, you are talking about Navillus?

D. O'Sullivan

A. Navillus.

Q. Did Times Square request Navillus provide a site safety inspector at Eighth Avenue?

A. Yes.

Q. Do you know when that request came in?

A. We commenced the foundation work.

Q. About when was that?

A. Fall of 2006.

Q. That was Wayne Murphy, he was the site inspector for Navillus at that time?

A. Yes.

Q. Let me ask you about Fergal Conefrey, when did he start working for Navillus?

A. Sometime during 2006.

Q. Started working for Navillus?

A. I'm sorry, Times Square. Navillus, I think '98, maybe, '97, '98.

Q. What was his job at Navillus?

A. Project manager, in the stone and tile division, when I say division, section maybe is a better word.

Q. When did he go to work for Times Square?

A. Sometime during 2006.

D. O'Sullivan

Q. What job did he have for Times Square?

A. I don't know.

Q. Was it a project manager?

A. He is the project manager -- my guys deal with 785.

Q. Were you involved in the decision pursuant to which Fergal went from Navillus to Times Square?

A. Again, I don't remember.

Q. Did you talk with your brother about Fergal going over to that company?

A. Probably did, again, I don't remember, but I probably did.

Q. Do you know why Fergal went from Navillus to Times Square?

A. He was answerable to Kevin when he worked with Navillus, because he worked under the tile and stone section, which was Kevin's section, as opposed to me.

Q. He was directly answerable?

A. Tile and stone was getting quiet at the time, so that was our decision.

Q. Was Kieran Power a Navillus employee?

A. No.

D. O'Sullivan

between 785 Partners, LLC and Times Square Construction, Inc. dated as of March 3, 2006.

The signature page of this rider appears to be nine pages in, which -- excuse me, 10 pages in, which is Bates stamp number 0119. Once again, the owner's signature is Jay Eisenstat, and then for contractor Times Square Construction, Inc., that's your signature; correct?

A. Yes.

Q. So is this, in fact, a rider to the general conditions to the contract between the owner of the property and Times Square Construction?

A. This is the same date as the last document you had shown me.

Q. Yes.

A. Sorry, what was your question?

Q. Is this, in fact, a rider to the general conditions of agreement between the owner of the Eighth Avenue property and Times Square Construction?

A. You know, I can't be sure, because

D. O'Sullivan

Kevin would have asked me to sign this if he wasn't here.

If I remember correctly, this has something to do with bank closing dates, issues like that, which if he wasn't here, he would have asked me to sign, because it would have had to be signed, so issues such as the bank, or applying for a condo plan, or something to that effect.

Q. Are you saying that in order to file for the condo plan, the owner of the property had to show that it had hired a construction manager?

A. I am not saying anything like that, it would be issues like that. Again, this general conditions I would never have read, or have never read.

Q. But you did sign it?

A. That is my signature, yes.

Q. The next page is titled amendment number 1 between -- to agreement between owner and construction manager?

MR. STURM: What page number?

MR. PETERSON: Bates stamp number 01120.

MR. STURM: Previous document, not the

D. O'Sullivan

next one.

MR. PETERSON: Next one.

MR. STURM: Weren't you referring to 1121 --

MR. PETERSON: No, 1119 --

Q. But by way of coming attractions, let's look at 1121, that is signed by you on behalf of Times Square Construction also; correct?

A. Correct, again, same date.

Q. March 3, 2006?

A. This would have been a case where I would have been asked to go in and -- Kevin would have asked me to go in and sign these documents all in one day. So that we know the process of these things, these would have been reviewed by Kevin's attorney, and he would have okayed, if he wasn't here, he would have okayed me, he would have asked me to go in and sign these, in order to again, let a bank closing proceed or something to that effect.

Q. Well, you are not saying you lacked the authority to bind Times Square Construction, are you?

A. What I'm saying is I would not have

D. O'Sullivan

read, or I haven't read any of these documents.

Q. But your signature on these documents was binding on behalf of Times Square; correct?

A. Correct.

Q. Let's go back to -- I mean let's talk about this period, March of 2006. At that time, Kevin was still an officer of Navillus; correct?

A. I don't know.

Q. I'd like to show you a document marked as Donal O'Sullivan 4.

(D. O'Sullivan Exhibit 4, document headed minutes of the meeting of the board of directors of Navillus Tile, Inc., marked for identification, as of this date.)

Q. This document is headed minutes of the meeting of the board of directors of Navillus Tile, Inc.

The third paragraph on the first page says resolved that the corporation accepts the resignation of Kevin O'Sullivan as executive vice president, secretary and treasurer and that such resignation would be effective as of September 5, 2006.

Does that refresh your recollection of

D. O'Sullivan

when Kevin resigned as an officer of Navillus?

A. Yes.

Q. Is that your signature at the bottom of the first page?

A. Yes.

Q. If we go to the second page, at the top it says approved by the president, that's your signature also?

A. Yes.

Q. Why did Kevin resign as an officer of Navillus Tile?

A. You'd have to ask him that.

Q. What did he say to you?

A. I don't remember.

Q. What did you say to him when he told you that he was going to resign?

A. I don't remember, I really don't remember.

Q. So there are two officers of a company that you and your brother have co-owned, for many years, and one day he just shows up and resigns? I mean can you tell us a little more about the circumstances under which he resigned?

A. I think earlier in my testimony I told

D. O'Sullivan

you that we had talked about development and that he was going to run the development side of -- he was going to run the development for both him and I. It is not like he showed up and said I'm going to resign.

Q. But he didn't actually resign until September, 2006?

A. No.

Q. Which was sometime after you had already started development?

A. It would -- have been an understanding that if he was going to run the development, for both him and I, that was what he was going to be doing, and it would have been an understanding that he was going to resign from Navillus.

As I said earlier, I ran -- everybody was answerable to me other than Kevin, I ran most of Navillus other than the stone and tile division.

So when he was going to run the development for him and I, it was just an understanding that he was going to resign, there was no big mystery about it. I was always doing the Navillus side of the work for the most part,

D. O'Sullivan

stone and tile was a very small portion of it, and then he was going on to run the development side, run the development for both him and I.

Q. Was there anything in particular happening in September of 2006 that caused him to resign then?

A. No, the truth be told, previous six months or year was just too busy to sit down and do it, that's the only reason it went out to September, 2006.

Q. By this point, a lot of the work at Eighth Avenue had already been subcontracted? When I say this point I mean September, 2006.

A. I don't know. I know that Kevin was well tied up with that project, months prior to September, 2006. My involvement with that was the conceptual estimate at the start, or -- pretty much covers it. When it came down to subs and all that type of stuff, I was -- I had nothing to do with that.

Q. In 2006, did Kevin draw a salary from Navillus?

A. I'm sure he did.

Q. Did you draw a salary from Navillus?

D. O'Sullivan

A. For a portion of 2006.

Q. What portion of 2006 did you draw a salary from Navillus?

A. Sorry, Kevin would have drawn a salary for a portion of the 2006.

Q. What portion?

A. Again, I don't know.

Q. Was it 11 months, or --

A. I have no idea, I have to -- I really don't know.

Q. Does Navillus maintain payroll records that you could review to determine --

A. Sure.

RQ MR. PETERSON: I have already requested payroll records, and I'd like to specify or repeat my request for a description of who was working for Navillus at what point in 2006, as reflected in the payroll records. So I have requested those payroll records.

Q. Would those payroll records also tell us when the other former Navillus employees went to Times Square, the people you were talking about earlier?

Page 61

D. O'Sullivan

asked.

MR. PETERSON: They are both June 30, 2007.

Q. Right?

A. There are two invoices; is that right?

Q. Right, sorry, I was asking about the one for second quarter and one for the third quarter. So you don't know if these are payments for second and third quarter?

A. Other than making -- it is two $9,000, bills and two $9,000 checks.

Q. But you don't have knowledge other than these documents?

A. No, I would have to see our records in the office.

RQ MR. PETERSON: If you could let me know if in fact we have this wrong, it appears the second and third quarter of '06 were paid in June of '07 and the fourth quarter of '06 was paid in September, '07. If in checking records that appears to be inaccurate, please let me know.

MR. STURM: Sure.

THE WITNESS: It wouldn't be unusual

Page 62

D. O'Sullivan

that a bill would be paid like that.

MS. PITTAWAY: I'll go ahead and ask my client, because I'm sure we have our own records.

MR. PETERSON: I would be surprised if it were anything other than what we think it is, but...

Q. Do you know a man named Nick Albanese?

A. Met him about ten years ago.

Q. Okay, in what circumstances did you meet Nick ten years ago?

A. He asked Navillus to be a payroll master on a job downtown. He was a business agent at the time.

Q. For Local 79?

A. Sorry, he might have been a business agent or an organizer, I'm not so sure, but it was 1996 or '7, there were people asking me if we could put an individual from 79 on as a payroll master on a job.

Q. And did you?

A. Yes.

Q. Do you know who the other contractor was?

Page 63

D. O'Sullivan

A. It wasn't a contractor, I think it was an owner. Actually I'm not that sure. It was 121 Reade Street was the address.

Q. Between then and 785 Eighth Avenue has Navillus served as a paymaster for anyone else?

A. I really don't know.

Q. Did you have any meetings or conversations with Nick Albanese between that job on Reade Street, and the summer of 2007?

A. No. I didn't have any conversations with him.

Q. In summer of 2007 either?

A. No.

Q. But Navillus did serve as a paymaster for Nick Albanese on the Eighth Avenue job at some point this year; correct?

A. For a week or so.

Q. How did that come about?

A. Times Square requested of Navillus to put on a -- somebody from 79 as -- asked us to be paymaster.

Q. Who at Times Square made this request?

A. I believe it was Fergal, and it wouldn't be to me.

Page 64

D. O'Sullivan

Q. Do you know who it was to?

A. Gabriel McCauley.

Q. Who is Gabriel McCauley?

A. My general superintendent.

Q. And he has responsibility for the Eighth Avenue job?

A. He has responsibility for all my labor.

Q. Do you know if anyone else at Navillus was communicated with, either by E-mail or phone, or in person, about the paymaster issue, about Navillus becoming a paymaster?

A. I don't know.

Q. Do you know if anyone other than Fergal at Times Square approached Navillus about becoming a paymaster?

A. I don't know.

Q. Do you know why Times Square asked Navillus to be a paymaster on the job?

A. As per Fergal, Local 79 personnel continuously calling him to bring someone on.

Q. Would this be a laborer to do general conditions work?

A. Again, whatever laborers do for

D. O'Sullivan

general contractors, I don't know what they do.

Q. Navillus has a collective bargaining agreement with Local 79?

A. Right.

Q. Approximately when was this, that Navillus became a paymaster?

A. I don't know, I think I was in Ireland at the time but that would have been the summer of 2006 sometime, '7.

Q. Did Navillus employ Local 79 members at the job site at that time?

A. Can't answer, don't know.

Q. Do you know what phase Navillus's work was in at that time at the job site?

A. Superstructure work.

Q. Do you know if in doing the superstructure work you employed 79 laborers?

A. No, you do not.

Q. So would a fair summary be that you don't know for a fact whether Navillus was employing other Local 79 members at that time, but the chances are it wasn't, because it was doing superstructure work; is that a fair statement?

A. Correct.

D. O'Sullivan

Q. Is there a reason that Navillus did not directly employ a laborer instead of serving as paymaster?

A. Wasn't our responsibility.

Q. Responsibility in what sense?

A. It wasn't our trade, we were doing superstructure concrete.

Q. Are you aware that Times Square requested that the laborer from Local 79 have safety certification?

A. I don't know. I heard talk about it, but... Fergal had sent the request to be on payroll master, someone from Local 79 office by the name of Tony Vita -- a better word harassed my superintendent, Gabriel. When I say harassed, I mean called every 15 minutes, to try and get him to force Times Square do put a 79 person on. Gabriel said to me it came to the point where he couldn't take another call from 79, which meant he couldn't even talk to the other business agents because he couldn't answer the phone, because of this harassment from Tony Vita.

He eventually did talk to -- and again some person from Local 79, and may have said they

D. O'Sullivan

had a safety license, it may help Times Square to put someone on. This is what I know. Come to think of it, Tony Vita called me quite a few times, I don't take his calls at all, he left several calls and messages, referring to Times Square.

Q. This was before the paymaster arrangement?

A. I guess, yes.

Q. What does it mean to be a paymaster?

A. What does it legally mean, or what do I think it means?

Q. What you think it means.

A. What I think it means, it is a way for Local 79 to get an employee hired by a nonunion contractor on a job.

Q. Did Gabriel ask you whether it was okay to -- for Navillus to serve as paymaster?

A. He probably did.

Q. And you approved it?

A. I probably would have.

Q. Why did you say yes?

A. Because every day we are not at work at a concrete job it can cost us up to $50,000 a

D. O'Sullivan

day, and 79 had threatened to put a picket on the job. My guys, concrete guys would not cross picket lines, so rather than I lose 50,000 or two days or three days, which adds up very, very quickly, Gabriel would have made or I would have made the decision, yes, if that's what they want to do, for us to keep the peace, we will do that.

Q. Who would have lost 50,000 a day?

A. Navillus, the concrete --

Q. But Navillus's arrangement was cost plus.

A. It is cost plus, normal production, but if we were just like any other job, if any job shuts down, we are expected to go to work, and they don't classify you and your pickets as being reason to shut down, by any contractor in the city.

Q. Did you speak with your brother about Local 79?

A. I don't know, I do know that Gabriel continually told Tony Vita deal with Times Square, nothing to do with us, Navillus had always had a good relationship, we paid half million dollars in benefits Local 79 every month -- go after Times

Page 73

D. O'Sullivan

said to me -- you would think they would -- you would think they would have had, you would think they would have sent someone that would work, but every day I go in there to visit the concrete job I see this individual standing at the gates doing nothing. No wonder Times Square are annoyed with him.

Q. So what is it that you did then once Gabriel said let's get out of this? What is it? When I say you, I'm speaking about Navillus.

A. Navillus would have contacted Times Square and said we are done with being payroll master, find somebody else.

Q. Do you know who at Navillus contacted Times Square?

A. Again, I don't.

Q. So you, by the same token, you don't know who at Times Square was talked to by Navillus?

A. No, but I would presume it would be Gabriel and Fergal, as they were dealing with the issues.

Q. Did Navillus pay Nick Albanese?

A. I think we might have paid him for a

Page 74

D. O'Sullivan

week or two, I'm not too sure.

Q. How did Navillus determine how many hours to pay him?

A. I don't know.

Q. Would Gabriel know?

A. Possibly, I don't know.

Q. Do you know if Gabriel kept records of when Nick Albanese worked?

A. No.

Q. That would have been Times Square's job to determine how many hours Nick Albanese worked?

A. I guess.

Q. Do you know what happened after Navillus notified Times Square it didn't want to be paymaster any more?

A. Directly after, I don't know, I think a picket was put up sometime thereafter.

Q. Do you know if another paymaster was -- another company was asked to be paymaster?

A. I have no idea.

Q. You mentioned that Gabriel said it looked like Nick Albanese was not doing any work; right?

Page 75

D. O'Sullivan

A. He just -- he mentioned in conversation to me that he goes to the job every day looking -- my general superintendent watching my concrete crew, and I think he was upset that he got tied into something where he -- where we accepted Navillus as being a paymaster of --

Q. Who got upset?

A. Gabriel, that 79 would send out such an individual, in order to keep the peace.

Q. Who was on the hook for the money, though, let's say this is accurate, Nick Albanese showed up and didn't perform any productive work. Whose pocket did the money that paid Albanese come out of?

A. We -- I think we paid him the first week, whatever Times Square would have -- Times Square would have told -- I'm not too sure on that one, but we would have paid for the first week, and we would bill Times Square.

Q. So anything that Navillus paid to Nick Albanese, you would simply bill Times Square for?

A. Correct.

Q. Is that in fact what happened here?

A. I have no idea.

Page 76

D. O'Sullivan

Q. Do you know if Times Square actually paid Navillus back for whatever it paid for Nick Albanese?

A. I don't know. I'd be surprised if they did.

Q. Why would you be surprised?

A. Because I think they hired someone to do work which they didn't get any production, they got -- someone that didn't work.

Q. But you didn't, Navillus didn't hire him; right?

A. We were the payroll master, we were billing Times Square.

Q. Okay. Navillus did not select Nick Albanese, though; correct?

A. No.

Q. Times Square selected Nick Albanese?

A. I have no idea where he came from.

Q. Who supervised Nick Albanese?

A. I don't know.

Q. Navillus didn't supervise Nick Albanese?

A. I don't believe so.

Q. Navillus didn't instruct Nick Albanese