**Exhibit D**

```
                              7BQYTIMF (2).txt
11    Q.   what was Time Square formed to do?
12    A.   Construction managers.
13    Q.   On which project?
14    A.   On 785.
15    Q.   And at the time that you first began to develop the
16    concept, where did you work on the project that came to be
17    known as 785 Eighth Avenue when you first started working on
18    it?
19    A.   At the Navillus office.
20    Q.   was there a reason why you didn't have a separate office at
21    that point?
22    A.   No.  It was a thought.  We didn't have anything solid,
23    concrete, we didn't have a job.  We were sourcing properties.
24    So we used Navillus's -- two or three Navillus's offices while
25    we were in that process.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                         40

```
      7BQMTIM2                       K. O'Sullivan - direct
 1    Q.   Did there come a point in time where you separately
 2    incorporated Time Square?
 3    A.   Yes.
 4    Q.   when was that?
 5    A.   I believe February 2006.
 6    Q.   And initially where was Time Square incorporated?
 7    A.   In the State of New York.
 8    Q.   And did that change?
 9    A.   Yes.
10    Q.   And why did it change?
11    A.   For legal advice that we should incorporate it in Delaware.
12    Q.   Did you then incorporate in Delaware?
13    A.   Yes.
14    Q.   Do you know what happened to the incorporation of Time
15    Square in New York?
16    A.   I believe I found out after, just a week ago, in speaking
17    to my brother Donal, we already had paid the fees to
18    incorporate Time Square construction in New York State, so the
19    fees were still there.  So Don decided that rather than have
20    those fees go to waste, he would incorporate Navillus
21    contracting.
22    Q.   was there ever a corporation Navillus Contracting before?
23    A.   As a DBA.
24    Q.   Now, did there come a point in time where Time Square got
25    its own offices?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                         41

```
      7BQMTIM2                       K. O'Sullivan - direct
 1    A.   Yes.
 2    Q.   When was that?
 3    A.   We began sourcing our offices early 2006.  We were
 4    negotiating a lease for approximately six, seven months.  We
 5    ended up taking possession, I believe, it was October 2006.
 6    Q.   And where is that office?
 7    A.   355 Lexington Avenue.
 8    Q.   How long is the lease?
 9    A.   Ten years.
10    Q.   By the way, Time Square, who are the owners of Time Square?
11    A.   Myself, my brother Donal.
12    Q.   what is the purpose of Time Square?
13    A.   Time Square is a developer and construction managers.
14    Q.   Is this work that Navillus Tile or any DBA of Navillus had
15    ever done before?
```

```
                                7BQYTIMF (2).txt
                                                                          72
         7BQYTIM3              O'Sullivan - cross
 1              THE COURT:  How long was it shut down?
 2              THE WITNESS:  It was shut down for a month and
 3       forensics, it's just a list that is going on and on and on.  It
 4       was quite a night and that's why I said I'm not so sure it was
 5       shut down strictly for that reason.
 6              THE COURT:  Is it up now?
 7              THE WITNESS:  Yes.
 8       BY MR. PETERSON:
 9       Q.  You testified that Navillus had done some general contract
10       work on public sector jobs, right?
11       A.  Yes.
12       Q.  And that typically it would self-perform 60 to 70 percent
13       of the work and then subcontract the rest, right?
14       A.  Something like that, yeah.
15       Q.  So when it would subcontractor with the subcontractors,
16       what arrangement -- how would the work of the subcontractor be
17       supervised on the job?
18       A.  They would be under the direction -- Navillus would assign
19       the project manager to the project so it would be the project
20       manager's responsibility to make insure it was coordinated.
21       Q.  So Navillus' project manager would make sure the sub did
22       their work according to contract and according to what was
23       needed on the job, right?
24       A.  Yes.
25       Q.  You testified that Time Square was set up in early 2006 to
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300
                                                                          73
         7BQYTIM3              O'Sullivan - cross
 1       perform the Eighth Avenue job.  Do you recall that?
 2       A.  It -- Time Square was incorporated, not just for that
 3       project, it was the new construction management and development
 4       company.
 5       Q.  And how did you come up with the term Time Square; just
 6       randomly?
 7       A.  I thought it was a nice name, actually.  I was surprised it
 8       wasn't gone.
 9       Q.  It's Time without an S?
10       A.  Yes.
11       Q.  That doesn't have anything to do with the fact that this
12       project is on Times Square?
13       A.  Oh, God no.
14       Q.  It's a coincident?
15              MR. COHEN:  It's not on the Times Square.
16              MR. PETERSON:  All right, withdrawn.
17       BY MR. PETERSON:
18       Q.  At the time that you and your brother entered into this
19       project to develop at 48th and Eighth, Time Square had no track
20       record of any kind?
21       A.  That's correct.
22       Q.  It had never functioned as a general contractor on any job?
23       A.  No.
24       Q.  Never functioned as a construction manager, right?
25       A.  No.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300
                                                                          74
         7BQYTIM3              O'Sullivan - cross
 1       Q.  Never let subcontractors or supervised subcontractors,
 2       right?
 3       A.  No.
                                    Page 34
```

```
                              7BQYTIMF (2).txt
    4     Q.  At that time Navillus had over 20 years in the business,
    5     right?
    6     A.  Yes.
    7              THE COURT:  Wait.  In what?  In what business?
    8              MR. PETERSON:  The construction business.
    9              THE COURT:  All right, in the construction business.
   10     A.  Okay.  Yes.
   11     Q.  And the initial meetings that you had with Mr. --
   12     withdrawn.
   13              You testified that your partners in the development,
   14     Mr. Scharf and Mr. Eisenstadt wanted Navillus to do the
   15     concrete work on the job, right?
   16     A.  Yes.
   17     Q.  And, in fact, the first critical phase of the work on the
   18     Eighth Avenue job was the concrete work, correct, the concrete
   19     foundation work and the concrete superstructure work?
   20     A.  No.
   21     Q.  What was the first work?
   22     A.  There were some buildings there that had to be demolished
   23     and the foundations had to be excavated.
   24     Q.  After the demolition, which was done by Russo, and after
   25     the excavation, the major work was concrete work?
                          SOUTHERN DISTRICT REPORTERS, P.C.
                                    (212) 805-0300
                                                                          75
          7BQYTIM3                       O'Sullivan - cross
    1     A.  The foundation was begun.
    2     Q.  All right.  And that was performed by Navillus?
    3     A.  Correct.
    4     Q.  Now, to your knowledge, has Navillus ever done a cost plus
    5     contract on a private sector job before?
    6     A.  I'm sure they have, yes.
    7     Q.  Do you know of any in your 20 years of experience with
    8     Navillus?
    9     A.  I would have done jobs -- I would be asked to do jobs
   10     myself when I was with Navillus, to do cost plus.
   11     Q.  Were they jobs that involved hundreds of millions of
   12     dollars in cost?
   13     A.  Hundreds of millions?
   14     Q.  Yes.
   15     A.  No.
   16     Q.  Were they jobs that were less than a million dollars?
   17     A.  They would be -- no, they would be in excess of a million
   18     dollars.
   19     Q.  And in the case of the Eighth Avenue job, your development
   20     partners said to you that they wanted Navillus to do the job
   21     because they thought Navillus would do the job -- I can't
   22     recall your exact words -- do the job right, do the job
   23     fairly -- wouldn't hold them up?  Was that your --
   24     A.  The concern was we didn't have a full set of drawings,
   25     construction documents, so they were nervous that we were
                          SOUTHERN DISTRICT REPORTERS, P.C.
                                    (212) 805-0300
                                                                          76
          7BQYTIM3                       O'Sullivan - cross
    1     constructing this 43 story building, Time Square would hire
    2     foundation contractor and a superstructure contractor and its
    3     like an open checkbook, you don't have any control.  That
    4     subcontractor can put a price on design changes the way he sees
    5     the design changes, the value of the design changes.  So the
    6     job could have been blown up, gone crazy, gone very expensive.
    7     The purpose was with Navillus we had control over it, that it
    8     was cost plus.
                                     Page 35
```

7BQYTIMF (2).txt

```
14   percent of the company to let him know what was going on.
15   Q.  So you gave him documents, whether he reviewed them or not
16   you don't know, you gave him documents?
17   A.  I think so, yes.
18   Q.  When Time Square would meet with potential sources of
19   financing for projects, you and Donal would both meet with the
20   potential sources of financing?
21   A.  At the beginning, yes.  Not know.
22   Q.  You did with respect to the Eighth Avenue project, right?
23   A.  Yes.
24   Q.  With respect to the lack of a bid on the concrete
25   superstructure concrete foundation and masonry work at Eighth
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                        79

```
     7BQYTIM3                       O'Sullivan - cross
 1   Avenue, all of the other trades you solicited bids for all of
 2   the other trades, correct?
 3   A.  Yes.
 4   Q.  You were asked a question about the cost plus arrangement
 5   that Navillus had and I believe Mr. Cohen asked you so that
 6   meant there was a guaranteed profit of ten percent from
 7   Navillus.  Is that right?
 8   A.  That would be correct.
 9   Q.  Navillus would get ten percent no matter what happened on
10   the job?
11   A.  What do you mean no matter what happens on the job?
12   Q.  In other words, Navillus gets paid its costs plus ten
13   percent no matter what the costs are?
14   A.  As long as they can back it up with the appropriate
15   paperwork.
16   Q.  Any shutdown on the job and so forth would not cost
17   Navillus any problems, right?
18   A.  No.
19   Q.  We were talking about the work that a laborer --
20   A.  Unless, let me just back up to that --
21          THE COURT:  Yes.
22   A.  That wouldn't be entirely true probably unless they
23   contributed to the shutdown.
24   Q.  Okay.  Under those circumstances, it wouldn't be entitled
25   to ten percent?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                        80

```
     7BQYTIM3                       O'Sullivan - cross
 1   A.  It would be a negotiation at a closeout.
 2   Q.  You remember you testified at your deposition that a
 3   concrete superstructure contractor could, in today's market,
 4   expect to make considerably more than ten percent profit.
 5         Do you recall testifying to that?
 6   A.  Yes.
 7   Q.  And that's true, correct?
 8   A.  Their margins would be above ten percent, yes.
 9   Q.  No, the margins --
10   A.  It could be above ten percent.
11   Q.  It could be as high as 20 percent?
12   A.  It could be.
13          THE WITNESS:  Can I say something, your Honor?
14          THE COURT:  Does it relate to a question?
15          THE WITNESS:  Yes, to that concrete lump sum plus.
16          MR. PETERSON:  There is not a question pending.
17          THE COURT:  How many questions back was that?  Asking
18   you about the cost plus contract?
                              Page 37
```

```
                            7BQYTIM3 (2).txt
   24    distribution from Navillus?
   25    A.  Yes.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
                                                                      83
         7BQYTIM3                    O'Sullivan - cross
    1    Q.  And similarly, the amount of profit that Time Square makes
    2    would affect the profit distribution both you and your brother
    3    would get from Time Square, correct?
    4    A.  That would be correct.  But if you are insinuating the ten
    5    percent profit to Navillus, I wouldn't consider that to be a
    6    great profit --
    7            THE COURT:  Great or not, at the end of the year
    8    whatever profit Navillus makes, it is good to you, you are a
    9    co-owner.
   10            THE WITNESS:  The more they make is good for me.
   11            THE COURT:  Good for you because you are a co-owner?
   12            THE WITNESS:  Yes.
   13    BY MR. PETERSON:
   14    Q.  You said that you only had been to Navillus' offices in
   15    Long Island City about a half dozen times in the past year and
   16    your brother only has been to Time Square's office about half a
   17    dozen times last year?
   18    A.  Plus or minus, yes.
   19    Q.  But you speak to your brother more often than that?
   20    A.  Yes, yes, I would talk, absolutely, yes.
   21    Q.  And I'm not talking about for family stuff, you speak with
   22    your brother about work-related matters more than a dozen times
   23    a year, don't you?
   24    A.  Yes.
   25    Q.  In fact, it's a lot more than a dozen times a year, isn't
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
                                                                      84
         7BQYTIM3                    O'Sullivan - cross
    1    it?
    2    A.  If it affects my project and he being a sub on it,
    3    absolutely, yeah.  It could be ten times a week if he wasn't
    4    performing properly.
    5    Q.  In June of 2007, were there seven other union locals at the
    6    Eighth Avenue job site in addition to Local 79?
    7    A.  You would have the carpenters, you would have the
    8    engineers, you would have the concrete laborers, you would have
    9    the concrete finishers, you would have the surveyors, so you
   10    would have about five or six.
   11    Q.  Right.
   12            And isn't it fair or isn't it accurate to say the
   13    general contractors sometimes, I don't know how frequently,
   14    sometimes employ laborers directly to perform the cleanup work
   15    with respect to the debris and the other materials left behind
   16    by the other trades?  Isn't that right?
   17    A.  Typically, any construction manager or general contractor
   18    would put as much of the work into the subs and not be
   19    responsible for anything themselves.
   20    Q.  But what Mr. Albanese was hired to do, putting aside
   21    whether he did a good job or didn't do a good job, but he was
   22    hired to do that kind of general condition cleanup work,
   23    correct?
   24    A.  He was hired to do your daily cleanup, which I had bought
   25    from Navillus anyway, but as I previously said, out of courtesy
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
                                                                      85
                                   Page 39
```

```
                              7BQYTIMF (2).txt
        7BQYTIM3                    O'Sullivan - cross
   1    I agreed to put him on if he would come with a site safety
   2    license.
   3    Q.   Let me just ask it again.
   4            The work, in addition to having a site safety license,
   5    the work you intended to have him perform what is known in the
   6    trade as general conditions work, cleanup work?
   7    A.   No, there was no need for a 79 person on the job at that
   8    early stages.  We buy the cleanup from the concrete person.  We
   9    didn't need a Local 79 person.
  10    Q.   So do you know who was doing it -- do you know what local
  11    union member was doing the cleanup work at that point?
  12    A.   The concrete laborers.
  13    Q.   Now, you have a 79 laborer on the job now, correct?
  14    A.   Yes.
  15    Q.   And what work does that 79er do?
  16    A.   He is doing work that Navillus should be doing.
  17    Q.   Well, is it general conditions work?
  18    A.   No, it's just cleanup.
  19    Q.   Cleanup?
  20    A.   Cleanup after my sub.
  21            THE COURT:  After my sub, you said?
  22            THE WITNESS:  My subcontractor which I bought as part
  23    of his scope.  So in essence I'm paying twice for it.
  24            THE COURT:  Part of his what?
  25            THE WITNESS:  Part of his scope of work.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
                                                                      86
        7BQYTIM3                    O'Sullivan - cross
   1    BY MR. PETERSON:
   2    Q.   But the Local 79 member who is currently working on the job
   3    and has been since July has been, for good or bad, fairly or
   4    unfairly, been doing that cleanup work, correct?
   5    A.   He has been doing the cleanup that the concrete laborers
   6    should be doing.
   7    Q.   Well, the laborers that are covered by the cost plus
   8    contract?
   9    A.   Yes.
  10    Q.   So if they are not there doing the work, you don't get
  11    charged for it, right?
  12            THE COURT:  You, Time Square?
  13    Q.   Time Square, right?
  14    A.   If, if, you can say that, yes.
  15    Q.   You were at Navillus when Navillus functioned as a
  16    paymaster in the past, correct?
  17    A.   That's correct.
  18    Q.   Were you personally involved in the paymaster work, the
  19    arrangement?  Do you have personal knowledge how being a
  20    paymaster worked?
  21    A.   Didn't have the knowledge.  I knew it was something out
  22    there that its just basically its ridiculous, just a shell
  23    that, whether it be a construction manager or developer that
  24    have to go through that, that person to get his benefits.
  25    Q.   Right.  And that construction manager developer would be
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
                                                                      87
        7BQYTIM3                    O'Sullivan - cross
   1    hiring somebody to do cleanup work or general conditions work,
   2    correct?
   3    A.   They could be hiring people for coffee.  I don't know.
   4    Q.   But in your experience, when Navillus has been a paymaster
                                    Page 40
```

```
                                7BQYTIMF (2).txt
  10    come up with -- give me thee names that he would consider a 79
  11    man would be a good person.
  12              Donal, I believe, talked to his management team or his
  13    labor team and he came up with three names.  That's how that
  14    person came about.  At least I knew then from, you know, that
  15    this guy -- I wouldn't have an issue with him, because at the
  16    beginning we won't have the issue anyway.
  17    Q.  Donal was the source of the name?
  18    A.  I asked for his help, I said give me three or four or five
  19    names that you would consider -- not you, find out from your
  20    labor people who, who would, who would work if he came on the
  21    project.
  22    Q.  When you say your labor people, you mean Navillus?
  23    A.  Yes.  Yes.
  24    Q.  You were talking about getting phone calls or contact from
  25    Lehr people after you left Navillus.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300
                                                                      90
        7BQYTIM3                   O'Sullivan - cross
   1              You said that you told them you were not at Navillus,
   2    but you said you would call Pat McCormick?
   3    A.  That's correct, yes.
   4    Q.  Did you, in fact, after you received these calls, call Pat?
   5    A.  I would, of course.
   6    Q.  You explained the nature of the problem --
   7    A.  I wouldn't know anything about the problem, but I said that
   8    the, Lehr are a good client.  Make sure you do the right thing.
   9    They are a good client.  Navillus had been doing work for ten,
  10    twelve, 14 years.  I said, you know, do the right thing for
  11    them.
  12              MR. PETERSON:  Thank you.
  13              THE COURT:  Anything further, Mr. Cohen?
  14              MR. COHEN:  Just one question.
  15              THE COURT:  Okay.
  16    REDIRECT EXAMINATION
  17    BY MR. COHEN:
  18    Q.  When Local 79 went on strike and they put up the picket
  19    line, I believe you already testified that all the other unions
  20    walked off the job?
  21    A.  That's correct.
  22    Q.  Did Time Square take any action against the union
  23    subcontractors on the job at that time?
  24    A.  We notified all our subcontractors that if they would not
  25    go back to work, we would enforce the contract documents and
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300
                                                                      91
        7BQYTIM3                   O'Sullivan - redirect
   1    which they would be terminated.
   2    Q.  And did you send that to all of your subcontractors?
   3    A.  We did.
   4    Q.  Including Navillus?
   5    A.  Including Navillus.
   6              MR. COHEN:  Nothing further.
   7              THE COURT:  Anything further, Mr. Peterson?
   8              MR. PETERSON:  Just to be clear.
   9    RECROSS EXAMINATION
  10    BY MR. PETERSON:
  11    Q.  None of the subs were actually terminated, though?
  12    A.  They were, actually.  We did send them letters that we were
  13    going to terminate them.  They were forced if they didn't
  14    return to work that they would be terminated.
                                 Page 42
```

```
                         7BQYTIMF (2).txt
 1    A.  I would just routinely walk by and check the progress.  I
 2    don't know how many exact times, but I started frequently
 3    visiting it as they were up about two, three floors on the job
 4    site.
 5    Q.  Now, did you speak with anyone from Time Square when you
 6    would go to the job site?
 7    A.  Originally, I was speaking with Wayne Murphy.
 8            THE COURT:  At that time was he with Navillus or --
 9            THE WITNESS:  He was with Navillus.
10    Q.  And what did Mr. Murphy say to you about Navillus or Time
11    Square about the project?
12    A.  Originally, the job site, from my knowledge, from what
13    Mr. Murphy told me, Navillus was the GC.  Upon frequenting it a
14    couple more times he told me I would have to start speaking to
15    Fergal.  Time Square Development was now taking over.
16    Q.  Did he say anything about the relationship between Navillus
17    and Time Square?
18    A.  He told me they were one in the same, and he didn't know --
19    he was advised to tell me to deal with Fergal.
20    Q.  And did you deal with Fergal?
21    A.  Yes, I did.
22    Q.  And what did Fergal say to you?
23    A.  He told me I would need to talk to Gabriel from Navillus as
24    far as putting 79 to work on the job.
25    Q.  And did you speak with Gabriel from Navillus?
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                       99
      7BQMTIM4                    Cangelosi - direct
 1    A.  Many-a-times.
 2    Q.  And what did Gabriel from Navillus tell you?
 3            MR. COHEN:  Objection.  Hearsay.
 4            THE COURT:  Navillus is not a party here, right?
 5            MR. COHEN:  Right.
 6            THE COURT:  The objection is sustained.
 7    Q.  Ultimately did you speak with anyone from either Navillus
 8    or Time Square about putting a Local 79 laborer on the job?
 9    A.  I spoke with Fergal.
10    Q.  And with Gabriel?
11            MR. COHEN:  Objection.  I don't --
12            THE COURT:  He's not saying what they said.
13            MR. PETERSON:  He just added, and Gabriel.
14            THE COURT:  Is that true, did he also -- did you also
15    speak with Gabriel?
16            THE WITNESS:  I spoke with Gabriel.
17            THE COURT:  Who is Gabriel?
18            THE WITNESS:  I believe he is the general foreman in
19    charge of labor for Navillus.
20            THE COURT:  Gabriel what?
21            THE WITNESS:  I do not know his last name.
22            MR. PETERSON:  He testified about that before.  I
23    wasn't testifying for him.
24    BY MR. PETERSON:
25    Q.  Ultimately, a Local 79 laborer was put on the job?
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                      100
      7BQMTIM4                    Cangelosi - direct
 1    A.  Correct.
 2    Q.  Did you speak with anyone from either Navillus or Time
 3    Square about which individual would be put on the job from
 4    Local 79?
 5    A.  No, I did not.
                                Page 46
```

7BQYTIMF (2).txt
```
 6   Q.  And did someone else from Local 79 do that?
 7   A.  It's possible John Brosnan did.
 8           MR. COHEN:  Objection.
 9           THE COURT:  You don't know?  You're speculating?
10           THE WITNESS:  I left direct orders with John Brosnan.
11   I left for vacation at the time the gentleman was put on the
12   job.  I left word to John Brosnan to take care of it,
13   doublecheck with Gabriel, make sure we are sending the man to
14   the job.  I believe he was supposed to send the guy there
15   originally on the 29th.
16           MR. COHEN:  Objection.
17           THE COURT:  what he was supposed to do is okay.
18   BY MR. PETERSON:
19   Q.  Ultimately, Nick Albanese was sent to the job?
20   A.  Yes.
21   Q.  Now, there came a point in time Mr. O'Sullivan was
22   testifying about a conversation he had with he believes it was
23   Tony Vita about putting a different Local 79 --
24           THE COURT:  who?
25           MR. PETERSON:  Kevin O'Sullivan testified that he had
                 SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
101
```
     7BQMTIM4                   Cangelosi - direct
 1   a conversation with he believed it was Tony Vita from Local 79
 2   about putting a different local --
 3           THE COURT:  who is Tony Vita?  What's his role?
 4           THE WITNESS:  He's the head of the grievance
 5   department.
 6           THE COURT:  Of the union?
 7           THE WITNESS:  Of the union.
 8   BY MR. PETERSON:
 9   Q.  Did you hear any of that conversation?
10   A.  Yes.  I was present, and I was on speaker call with Kevin
11   and Tony.
12   Q.  And what did Kevin say to Tony?
13   A.  Kevin was insistent that the only way we were going to put
14   a guy back to the job was if he had to take one of his guys.
15   He was speaking with Gabriel.  As far as I know, he was getting
16   names from Gabriel.
17           MR. COHEN:  Objection, your Honor.
18           THE COURT:  Sustained as to that and that's stricken.
19   BY MR. PETERSON:
20   Q.  Did he say anything about where he got the names?  Did
21   Kevin O'Sullivan say where he got the names?
22   A.  He was talking to Gabriel.
23   Q.  Did he say that?
24   A.  Yes, he did say that.  He said I have to check with
25   Gabriel.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
102
```
     7BQMTIM4                   Cangelosi - direct
 1   Q.  what else did Kevin say about who the Local 79 person would
 2   be?
 3   A.  What else did he say about the guy?
 4   Q.  Yeah.
 5   A.  Basically, if we were going to put anybody back, it was
 6   going to be one of his guys.
 7   Q.  And ultimately who did Local 79 send to the job?
 8   A.  Barreston Morgan.
 9   Q.  Do you know where he was working before he was sent --
10   A.  I don't know exactly what job site, but he was serving as a
                            Page 47
```

```
                             7BQYTIMF (2).txt
       11    steward somewhere downtown on a Navillus job site.
       12    Q.  Now, during your deposition you were asked about who you
       13    filed a grievance against in connection with the Nick Albanese
       14    situation.  Do you recall that?
       15    A.  Correct.
       16    Q.  Who did you file the grievance against?
       17    A.  Navillus.
       18    Q.  Why did you file against Navillus?
       19    A.  Because Navillus has a collective bargaining agreement with
       20    the local.
       21    Q.  Now, were you involved in the decision about whether to
       22    arbitrate that grievance?
       23    A.  No, I was not.
       24    Q.  Is that part of your job, to decide which --
       25    A.  No, it's not.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
                                                                        103
             7BQMTIM4                         Cangelosi - direct
        1    Q.  Is it part of your job to decide who grievances are
        2    arbitrated against?
        3    A.  No, it is not.
        4            MR. PETERSON:  Thank you.  I have nothing further.
        5    CROSS-EXAMINATION
        6    BY MR. COHEN:
        7    Q.  What was Mr. Murphy's position with Navillus?  Do you know?
        8            THE COURT:  When?
        9            MR. COHEN:  With Navillus.
       10            THE COURT:  He may have been with Navillus forever.
       11    In '06?
       12    Q.  You said you spoke to Mr. Murphy in '06.  Are you sure it
       13    wasn't '07?
       14    A.  It was '07.
       15    Q.  It was '07?
       16    A.  It was '07.
       17    Q.  It wasn't February of '06?
       18    A.  No.  It was '07.
       19            THE COURT:  What was his position at Navillus at that
       20    time?
       21            THE WITNESS:  He was the site safety manager on the
       22    job.
       23    Q.  Do you know whether he was the site safety manager or was
       24    he a site safety person?
       25    A.  Site safety guy, the site safety guy on the job.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
                                                                        104
             7BQMTIM4                         Cangelosi - cross
        1    Q.  Do you know whether he was a manager?
        2    A.  No, I do not know if he was a manager.
        3    Q.  As far as you know, he was just a rank and file hourly paid
        4    employee?
        5    A.  Rank and file being what, a member of the local?
        6    Q.  He was an hourly paid employee at that point in time?
        7    A.  Yes.
        8    Q.  He wasn't a manager at that point?
        9    A.  I guess he was an hourly, if you say he was.
       10    Q.  I'm asking, do you know?
       11    A.  No, I don't know.
       12    Q.  Do you know whether he was a manager, whether he had
       13    authority to speak on behalf of Navillus?
       14    A.  No, I don't know if he had support to speak on behalf of
       15    Navillus.
                                   Page 48
```