

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------- X

TIME SQUARE CONSTRUCTION, INC.,

                **Plaintiff,**

   - against -

**MASON TENDERS DISTRICT**
**COUNCIL OF GREATER NEW YORK &**
**LONG ISLAND and CONSTRUCTION**
**GENERAL LABORERS JATC, LOCAL**
**UNION NO. 79,**

                **Defendants.**
-------------------------------------------------- X

## OPINION AND ORDER

**07 Civ. 7250 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Defendant Mason Tenders District Council of Greater New York & Long Island ("MTDC") and Construction General Laborers JATC, Local Union No. 79 (the "Union") have served a notice to arbitrate on Navillus Tile, Inc. ("Navillus"), an entity not named in this litigation, as well as plaintiff Time Square Construction, Inc. ("Time Square"). Time Square now moves to enjoin defendants from compelling it to arbitrate. For the reasons stated below, this motion is granted.

1

## II.    BACKGROUND[1]

### A.    Time Square Corp. and Navillus Tile, Inc.

Navillus is a corporation that performs various types of masonry and structural construction work.[2] It employs approximately 7800 people.[3] Although Navillus generally operates as a subcontractor, it occasionally acts as a general contractor for sites where a majority of the work involves masonry and tiling.[4] Navillus has been in operation since 1987.[5] The company is owned by brothers Kevin and Donal O'Sullivan.[6] For some time, Kevin was Vice President of Navillus.[7]

Around 2004 or 2005, Kevin decided to launch a new business

---

[1]    Except where indicated, the facts in this section are either stipulated to by the parties, or are the Court's conclusions based on uncontradicted evidence.

[2]    *See* 11/26/07 Testimony of Kevin O'Sullivan ("O'Sullivan Tr."), at 36.

[3]    *See id.*

[4]    *See id.*

[5]    *See* Deposition of Donal O'Sullivan at 5, Ex. B to Declaration of Joel E. Cohen ("Cohen Decl.").

[6]    *See* O'Sullivan Tr. at 37.

[7]    *See id.*

venture as a general contractor that would build properties.[8]  The brothers and two

co-owners purchased a property on 48th Street and 8th Avenue (the "Project") and

formed Time Square.[9]  Kevin, who resigned from Navillus,[10] became President of

Time Square, and the company is owned by the two brothers.[11]  Kevin is and has

always been the only officer of Time Square.[12]  Although Donal shares in the

profits of Time Square, he is not an officer or director of the company and he has

minimal involvement in its operations.[13]

       Originally, Time Square rented space in Navillus's offices in Long

Island City.[14]  Around February 2006, it was incorporated as a New York

corporation[15] and signed a ten-year lease on office space in Manhattan, which it

---

[8]     *See id.* at 37-39.

[9]     *See id.* at 39.

[10]    *See* Minutes of the Meeting of the Board of Directors of Navillus
Tile, Inc., Ex. G to Cohen Decl. (accepting Kevin's resignation from the positions
of Executive Vice President, Secretary, and Treasurer).

[11]    *See* O'Sullivan Tr. at 35, 41, 43.

[12]    *See* Deposition of Kevin O'Sullivan at 5, Ex. C to Cohen Decl.

[13]    *See* O'Sullivan Tr. at 43.

[14]    *See id.* at 39; Invoices for Rent, Rent Checks, and Lease Summary,
Ex. F to Cohen Decl.

[15]    It was later reincorporated in Delaware. *See* O'Sullivan Tr. at 40;
Certificate of Incorporation, Ex. D to Cohen Decl.

occupied in October 2006.[16]  Several employees of Navillus, including Project

Manager Fergal Confrey, Anthony Del Greco, and Thea Clark moved to Time

Square's payroll in 2006, and Project Superintendent Lenny Kelly transferred to

Time Square in 2007.[17]  Navillus and Time Square have separate bank accounts,

financial statements, insurance policies, and payroll.[18]

Although Donal is not a director or officer of Navillus, he has, on

occasion, signed documents on behalf of Navillus.  Kevin states that this has

occurred only when he is inaccessible and time is of the essence.[19]

### B.    The 48th Street Project

Time Square is the general contractor of the 48th Street Project (the

"Project"), which involves construction of a forty-three-story condominium.[20]  As

general contractor, Time Square hires subcontractors to perform various jobs.  For

example, the first subcontractor hired was Russo Wrecking, which demolished the

---

[16]    *See* O'Sullivan Tr. at 40-41.

[17]    *See* Summary of Evidence ("Summ.") ¶¶ 20-23; O'Sullivan Tr. at 41-42.  Although the Summary of Evidence was prepared only by defendants, at oral argument plaintiff indicated which items were not contested.  *See* Tr. at 2-30.

[18]    *See* O'Sullivan Tr. at 42-43.

[19]    *See id.* at 51.

[20]    *See id.* at 44.

4

existing structure on the property.[21]  Several unions, including defendants, provide

workers for the site.[22]

The concrete superstructure and masonry work on the Project was

subcontracted to Navillus.[23]  Navillus was hired because Time Square did not

possess a complete set of construction documents and was therefore required to

place substantial trust in its superstructure contractor.[24]

Time Square also has another project, a thirty-six story condominium

on 34th Street, on which Navillus is also a subcontractor.[25]  Navillus obtained that

role through a competitive bidding process.[26]

At the Project site, Time Square employs a project manager, a

superintendent, and a site safety manager.[27]  The other workers are employed by

the subcontractors.  For example, Kew Electric, the company subcontracted to

---

[21]  *See id.* at 45.

[22]  *See id.* at 54.

[23]  *See* Summ. ¶ 15; *see also* 10/18/06 Subcontract, Ex. H to Cohen Decl.

[24]  *See* O'Sullivan Tr. at 46.

[25]  *See id.* at 47-48.

[26]  *See id.* at 48.

[27]  *See id.* at 49.

perform electrical work, has on site electricians, a project manager, and a foreman.[28]

At the Project site, Navillus has a superintendent, a project manager, carpenters, concrete finishers, and other related workers.[29] As a subcontractor, Navillus is entirely responsible for personnel decisions, including whom to hire and fire, how work should be assigned, and other personnel decisions.[30]

Navillus is a member of the Building Contractors Association, a bargaining association that has a collective bargaining agreement (the "CBA") with defendants.[31] Navillus is thus a party to the CBA.[32] Time Square is not a member of any such association and is not a party to the CBA.

## C.    Hiring of Nicholas Albanese

In May 2007, representatives of the Union approached Navillus and Time Square to request that Union workers be employed at the Project.[33]

---

[28]    *See id.*

[29]    *See id.*

[30]    *See id.* at 50.

[31]    *See* Summ. ¶ 2.

[32]    *See id.*

[33]    *See id.* ¶ 29.

Although Time Square had no need of union workers, because Navillus's

relationship with the Union was valuable and Time Square wanted Navillus to

avoid potential labor issues, Time Square agreed to hire a Union worker.[34]

Nicholas Albanese was sent to the Project to be shop steward.[35]

Although Time Square agreed to hire a Union worker to assist with

clean-up, it required that the employee have a site safety license.[36]  Construction

on such a site in Manhattan cannot proceed unless an employee with a site safety

license is on site at all times, and licensed employees are difficult to find.[37]  Time

Square hoped to find a licensed employee with whom it could forge a permanent

relationship.[38]

Albanese was paid by Time Square through Navillus pursuant to a

paymaster agreement,[39] but did not otherwise play a role in Albanese's

---

[34]    *See* O'Sullivan Tr. at 56.

[35]    *See* Summ. ¶¶ 31, 32.

[36]    *See* O'Sullivan Tr. at 57.

[37]    *See id.* at 57-58.

[38]    *See id.* at 58.

[39]    *See* Summ. ¶ 34.  When a union employee is employed by a non-
union company, the employee will generally be paid pursuant to a "paymaster"
arrangement, whereby a company that has signed the relevant collective
bargaining agreement takes responsibility for ensuring that the employee receives

employment.[40]  Under the CBA, a company that served as a paymaster agreed that it and the company for which it serves are "joint employers and one another's agents for all work performed at the site.  The companies in the paymaster relationship shall be jointly and severally liable for all violations of this Agreement committed by either . . . ."[41]

The relationship between Albanese and Time Square soured.  To avoid getting caught in the middle of the dispute and thus damaging its relationship with the Union, Navillus asked to be relieved of its role as paymaster. Time Square then arranged for Par Wrecking to take over as paymaster.[42] Disputes between Albanese and Time Square continued, and Albanese's relationship with Time Square was terminated.

## D.    Procedural Posture

Defendants filed a grievance against Navillus asserting that Albanese

---

the benefits specified by that agreement.  *See* O'Sullivan Tr. at 56-57; Deposition of Joseph Cangelosi, Business Agent for Local 79, at 8-10, Ex. C to Affidavit of Lowell Peterson, counsel to defendants.

[40]    *See* O'Sullivan Tr. at 58.

[41]    *See* Trade Agreement Between Building Contractors Association, Inc. and Mason Tenders District Council of Greater New York, Exhibit Binder document no. 1.

[42]    *See* O'Sullivan Tr. at 60.

8

was owed thirteen hours of overtime and that various other violations of the CBA occurred, and that Navillus was responsible as paymaster pursuant to the CBA.[43] When the grievance was unsuccessful, defendants began an arbitration proceeding pursuant to the CBA. However, defendants named both Time Square and Navillus as defendants in the arbitration proceeding.[44] Although Time Square is not a signatory to the CBA, defendants claim that Time Square is an alter ego of Navillus, and that Time Square is therefore required to arbitrate the dispute. Time Square now asks this Court to enjoin defendants from compelling Time Square to arbitrate on the ground that it is not bound by the CBA.

## III.   APPLICABLE LAW

### A.    Preliminary Injunction

Although the decision whether to grant a preliminary injunction lies squarely within the court's discretion, "a preliminary injunction is an extraordinary measure that should not be routinely granted."[45] In order to obtain a preliminary

---

[43]    *See* 6/14/07 Letter from Anthony Vita, Grievance Department Head, to Navillus, attention Donal O'Sullivan, Ex. L to Cohen Decl.

[44]    *See* 7/13/07 Letter from Tamir W. Rosenblum, General Counsel, MTDC, to Navillus and Time Square, Ex. L to Cohen Decl.

[45]    *Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 597 (S.D.N.Y. 2001) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

injunction, a plaintiff must ordinarily demonstrate: (1) the possibility of irreparable harm; and (2) either (a) a likelihood of success on the merits, or (b) a sufficiently serious question going to the merits combined with a balance of hardships tipping decidedly in favor of the moving party.[46] Irreparable harm is "an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."[47]

### B.    Collective Bargaining and Double-Breasted Companies

A construction site is typically managed by a general contractor, which hires subcontractors to perform tasks such as plumbing, masonry, and electricity. Some general contractors hire only subcontractors that employ union workers, while other contractors are willing to hire subcontractors that employ nonunion workers. Because nonunion workers generally receive lower wages and benefits, employers seek to use them when possible. Subcontractors at times create "double-breasted" operations, in which a "unionized employer . . . creates

---

[46]    *See Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 152-53 (2d Cir. 2007); *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.,* 211 F.3d 21, 24 (2d Cir. 2000).

[47]    *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005).

an ostensibly separate firm with a nonunion workforce."[48]  The subcontractor then

uses its nonunion company when possible and its union company only when

necessary.[49]  A double-breasted operation is not *per se* illegal, but the nonunion

company "may be held liable for debts and other obligations of [the other], and in

some cases may be bound to the collective bargaining agreement of the other

entity."[50]

   While courts must be vigilant to prevent companies from evading

their responsibilities to unions by reincorporating, some unions have taken

advantage of this vigilance to obtain the unionization of the workforce without

utilizing the standard procedures.  The Second Circuit has "consistently guarded

against attempts by unions to gain representation of separate bargaining units

---

[48] Stephen F. Befort, *Labor Law and the Double-Breasted Employer*, 1987 Wisc. L. Rev. 67, 67.

[49] Some critics blame the advent of the double-breasted company for "stagnation of real wages and the erosion of union strength in the construction industry."  Ben Marsh, Comment, *Corporate Shell Games*, 2 U. Pa. J. Lab. & Emp. L. 543, 545 (2000) (citing Lisa Belkin, *Showdown at Yazoo Industries*, N.Y. Times, Jan. 21, 1996, at 27; Steven G. Allen, *Unit Costs, Legal Shocks, and Unionization in Construction*, 16 J. Lab. Res. 367, 375-76 (1995)).

[50] *King v. Audax Const. Corp.*, No. 02 Civ. 582, 2007 WL 2582103, at *3 n.9 (E.D.N.Y. Sept. 5, 2007).

through methods other than elections."[51]  Thus, in situations (such as this one)
where a union asserts that owners of a company are attempting to evade a
collective bargaining agreement by creating a new entity, the court must determine
whether the new entity represents an evasion of a company's bargaining
responsibilities to the union, or if the union's claim is an attempt to organize
workers in the new entity without elections.

This inquiry focuses on the relationship between the old and new
companies.  There are three doctrines that may apply to the companies – alter ego,
single employer, and joint employer.

### 1.    Alter Ego / Veil Piercing

"In some instances, the corporate relationship between a parent and
its subsidiary [is] sufficiently close as to justify piercing the corporate veil and
holding one corporation legally accountable for the actions of the other."[52]  Courts
pierce the corporate veil "to prevent fraud or other wrong, or where a parent

---

[51]     *Local One, Amalgamated Lithographers v. Stearns & Beale, Inc.*, 812
F.2d 763, 772 (2d Cir. 1987).

[52]     *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777
(2d Cir. 1995).

dominates and controls a subsidiary."[53]  Veil piercing determinations are fact-

specific and are highly sensitive to "the circumstances of each case."[54]  "[A] parent

corporation and its subsidiary lose their distinct corporate identities when their

conduct demonstrates a virtual abandonment of separateness."[55]  Veil piercing in

the contract context is infrequent because the party seeking relief "is presumed to

have voluntarily and knowingly entered into an agreement with a corporate entity,

and is expected to suffer the consequences of limited liability associated with the

business form."[56]

Factors that are relevant to determining whether a corporation's form

should be respected include:

> "(1) disregard of corporate formalities; (2) inadequate
> capitalization; (3) intermingling of funds; (4) overlap in
> ownership, officers, directors, and personnel; (5) common
> office space, address and telephone numbers of corporate
> entities; (6) the degree of discretion shown by the allegedly
> dominated corporation; (7) whether the dealings between
> the entities are at arms length; (8) whether the corporations
> are treated as independent profit centers; (9) payment or

---

[53]    *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l*, 2 F.3d 24,
26 (2d Cir. 1993).

[54]    *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988).

[55]    *Thomson-CSF*, 64 F.3d at 778 (citing *Carte Blanche*, 2 F.3d at 29).

[56]    1 William Mead Fletcher *et al.*, *Fletcher Cyclopedia of the Law of
Private Corporations* § 41.85 (perm. ed. rev. vol. 1999).

guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities."[57]

## 2.    Single Employer Doctrine

The single employer doctrine permits two entities to be treated as a single employer "to determine liability for unfair labor practices, to determine whether or not union picketing is directed at a neutral 'secondary employer,' to determine whether a union may seek to represent the employees of two enterprises in a single bargaining unit, and to determine whether an employer employs enough workers to satisfy NLRA jurisdictional limits."[58] Thus, where the doctrine applies, an employee "may impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer."[59] This doctrine is a labor law concept, and is conceptually distinct from the contract and agency principle of alter ego.[60]

---

[57]    *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (quoting *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997)).

[58]    *Murray v. Miner*, 74 F.3d 402, 404 n.1 (2d Cir. 1996).

[59]    *Arculeo v. On-Site Sales & Marketing, LLC*, 425 F.3d 193, 198 (2d Cir. 2005).

[60]    Some courts have observed that the tests overlap to a degree that suggests they are the same inquiry. *See Crest Tankers, Inc. v. National Maritime Union*, 796 F.2d 234, 236 n.1 (8th Cir. 1986) ("We discuss 'single employer' and

14

To determine whether two entities are a single employer, courts look to "'interrelation of operations, centralized control of labor relations, common management, and common ownership or financial control.'"[61] The second factor is the most significant.[62] "Also relevant are the use of common office facilities and equipment and family connections between or among the various enterprises."[63]

If a company is found to be a single employer with an entity that has signed a CBA, the company can in some circumstances be bound to that CBA. But "the determination that separate companies are a 'single employer' is not enough to bind all the separate companies to the collective bargaining agreements of any one of the companies."[64] "As a matter of law . . . it is against public policy to bind a non-signatory company where the employees of both companies do not

---

'alter ego' in this opinion as if they were two separate ideas. . . . In fact, what is really happening, it seems to us, is that a number of factors . . . are being treated as relevant to the question whether one employer, formally separate, should be viewed as legally the same as another.").

[61]    *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995) (quoting *Garcia v. Elf Atochem N. Am.*, 28 F.3d 446, 450 (5th Cir. 1994)).

[62]    *See id.* at 1241 ("We focus our inquiry . . . on the second factor, centralized control of labor relations.").

[63]    *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996).

[64]    *Id.* at 747-48.

15

constitute a single collective bargaining unit."[65] Thus, "to bind a non-signatory

company to a collective bargaining agreement, both single employer and single

bargaining unit status must be found."[66] "To achieve the goal of creating a viable

bargaining unit, factors such as bargaining history, operational integration,

geographic proximity, common supervision, similarity in job function and degree

of employee interchange will be examined."[67]

### 3.    Joint Employer Doctrine

To determine if two companies are joint employers, the goal is to

determine if the alleged second employer "possessed the power to control the

workers in question."[68] "A joint employer relationship may be found to exist

where there is sufficient evidence that [one company has] immediate control over

---

[65]    *Local One,* 812 F.2d at 771.

[66]    *Id.* at 770. *Accord Truck Drivers Local Union No. 807 v. Regional Import & Export Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991) ("The alter ego doctrine provides an analytical hook to bind a non-signatory to a collective bargaining agreement. The alter ego doctrine, while having the same binding effect on a non-signatory as the single employer/single unit doctrine, is conceptually distinct.") (citations omitted).

[67]    *Cuyahoga Wrecking Corp. v. Laborers Int'l Union, Local Union No. 210,* 644 F. Supp. 878, 882 (W.D.N.Y. 1986) (citing *NLRB v. J.C. Penney Co.*, 559 F.2d 373, 375 (5th Cir. 1977)).

[68]    *Herman v. RSR Security Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). *Accord Cook*, 69 F.3d at 1241 ("We focus our inquiry . . . on the second factor, centralized control of labor relations.").

the other company's employees.  Relevant factors include commonality of hiring,

firing, discipline, pay, insurance, records, and supervision."[69]  In the context of the

Fair Labor Standards Act, the Second Circuit has cautioned that district courts

must "look beyond an entity's formal right to control the physical performance of

another's work before declaring that the entity is not an employer . . . ."[70]  The test

must be flexible, based on "'the circumstances of the whole activity,'" and should

consider any factors "relevant to . . . the economic realities."[71]

Where this doctrine applies, "an employee, formally employed by

one entity, who has been assigned to work in circumstances that justify the

conclusion that the employee is at the same time constructively employed by

another entity, may impose liability for violations of employment law on the

constructive employer . . . ."[72]  As with the doctrine of single employers, a non-

signatory to a CBA cannot be bound to that CBA absent a finding that the

---

[69]    *NLRB v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir. 1994)
(citing *Clinton's Ditch Coop. v. NLRB*, 778 F.2d 132, 138-39 (2d Cir. 1985)).

[70]    *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 69 (2d Cir. 2003).

[71]    *Id.* at 71-72 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S.
722, 730 (1947)).

[72]    *Arculeo*, 425 F.3d at 198.

17

employees of the two companies constitute a single bargaining unit.[73]

A conclusion that two employers are joint employers is different from the conclusion that they are single employers. Single employers are actually "part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.'"[74] Joint employers are separate companies that have "have merely chosen to handle certain aspects of their employer-employee relationships jointly."[75]

## IV.   DISCUSSION

The evidence in this case strongly suggests that the instant dispute has been manufactured to obtain a favorable ruling from this Court. Defendants assert that if they "went ahead with the arbitration against Navillus, an arbitrator could rule that the CBA was violated and could direct that Albanese be paid. Navillus would be liable, although it might seek reimbursement from Time Square."[76] This would resolve the underlying grievance. Defendants have instead chosen to proceed against Time Square, presumably to bind it to a collective

---

[73]    *See Local One,* 812 F.2d at 771.

[74]    *Clinton's Ditch Coop.*, 778 F.2d at 137 (quoting *NLRB v. Browning-Ferris Indus.*, 691 F.2d 1117, 1122 (3d Cir. 1982));

[75]    *Id.* (citing *Browning-Ferris*, 691 F.2d at 1122).

[76]    Defendants' Reply Memorandum of Law ("Def. Mem."), at 23.

18

bargaining agreement.  Although the amount in controversy in this case is minimal

compared to the cost of litigation, Time Square is not pursuing a settlement, again

presumably because it seeks a ruling that the CBA does not apply to Time Square.

Nevertheless, because there is a real dispute, however *de minimis* it may appear,

the parties have a right to an adjudication.

### A.    Possibility of Irreparable Harm

Time Square contends that it would suffer irreparable harm if forced

to arbitrate despite the lack of a valid arbitration agreement.[77]  Defendants do not

contest this position, and so implicitly concede that irreparable harm will occur if

Time Square's arguments are accepted.[78]

### B.    Veil Piercing

Defendants argue that Time Square is an alter ego of Navillus and so

is bound by the CBA.[79]  I disagree.  Albanese was hired no earlier than May

---

[77]    *See* Memorandum of Law in Support of Motion for Preliminary
Injunction ("Pl. Mem."), at 14.

[78]    *See Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129
(2d Cir. 2003) (finding that a party "'would be irreparably harmed by being forced
to expend time and resources arbitrating an issue that is not arbitrable, and for
which any award would not be enforceable.'") (quoting *Maryland Casualty Co. v.
Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 985 (2d Cir. 1997)).

[79]    *See* Def. Mem. at 22.

2007.[80]  At that time, the undisputed evidence demonstrates that Time Square had

a formal corporate existence, sufficient capitalization, and office space, and

freedom to act independent of Navillus.  Time Square and Navillus have generally

made proper use of the formalities of corporate existence.[81]  Other factors indicate

that the two companies are not alter egos.  While Time Square concedes that it

hired several employees from Navillus, there is no evidence to contradict Time

Square's claim that those employees left Navillus when they moved to Time

Square.  The companies do not share officers,[82] Navillus did not guarantee Time

Square's debts, and the two companies did not intermingle their property.[83]

---

[80]    *See* Summ. ¶¶ 29, 31.

[81]    *See Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50,
53 (2d Cir. 1984) (noting that respect for corporate formalities is a factor in
determining whether to pierce the corporate veil).  There are some irregularities in
the formation of the two companies – for example, Time Square was first
incorporated in New York and then reincorporated in Delaware, and Navillus then
made use of Time Square's New York registration, ostensibly to save filing fees.
*See* O'Sullivan Tr. at 40.  However, the irregularities are relatively minor and there
is no evidence that the companies disregarded the formalities that attend
corporations since that time.

[82]    I find that Donal never served as an officer of Time Square despite
some evidence that on occasion he signed documents on behalf of the company.
The evidence reveals that he only did so when Kevin was unavailable, and that he
had no role in the management of the company. *See, e.g.,* O'Sullivan Tr. at 83
(noting that Donal rarely visited Time Square's offices).

[83]    *Cf. William Passalacqua Builders, Inc. v. Resnick Developers South,
Inc.*, 933 F.2d 131, 139 (2d Cir. 1991) (finding that corporations were alter egos

Further, the evidence indicates that Time Square was incorporated for a purpose somewhat different from that of Navillus – while Navillus primarily engages in masonry and tile work, Time Square appears to have broader development goals. Time Square was intended to act as a general contractor and a developer. Uncontradicted evidence indicates that Navillus has acted as a general contractor only on public renovation sites where the masonry and tile work was a majority of the overall project.[84] Time Square is thus an independent profit center from Navillus.

Certain factors, such as the overlap in ownership and the lack of arms-length interaction between the companies, do weigh in favor of a finding that the corporations are alter egos.[85] However, these factors are not sufficient to

---

where they shared officers, office space, intermingled funds, and were not treated as separate profit centers).

[84]    *See* O'Sullivan Tr. at 36.

[85]    Defendants also point to a number of minor incidents that they say suggest that the companies are intertwined. These include a statement by Site Safety Supervisor Wayne Murphy that Time Square and Navillus were the "same company" and Time Square's representation to the City Department of Buildings that Murphy, who was employed by Navillus, was "our" site safety inspector. *See* Testimony of Joseph Cangelosi, 11/26 Tr. at 98; 6/11/07 Email from Fergal Conefrey of Time Square to the New York City Buildings Department, Exhibit Binder document no. 19. Time Square denies that the first remark was made and states that the latter representation simply indicated that Murphy was the site safety inspector for the site. *See* Testimony of Wayne Murphy, 11/26 Tr. at 93-94.

outweigh the bulk of the evidence.

Not surprisingly for companies that are run by siblings, Time Square and Navillus have a closer relationship than is normal for unrelated companies in the construction industry. Nevertheless, based on the totality of the circumstances, as of May 2007, the corporations are not so intertwined that they can be considered alter egos.

### C.    **Single Employer**

Defendants also claim that Time Square and Navillus are "single employers" and so Time Square is subject to the CBA signed by Navillus.[86] As of May 2007, Time Square and Navillus have separate management and operations – which weighs against a finding that they are a single employer – but have common ownership – which weighs in favor of that finding. However, the most significant factor, centralized control of labor relations, is not present. There is no convincing evidence that Navillus played any role in Time Square's employment decisions.[87]

---

I find that Murphy would have had no basis for knowing the corporate structure of the general contractor and subcontractor on the site, and that Time Square's explanation of the site safety inspector representation is quite plausible.

[86]    *See* Def. Mem. at 15-16.

[87]    *Cf. Cook*, 69 F.3d at 1241 (finding that single employer status could exist where applications for employment with a subsidiary went through the parent and the parent approved personnel reports and major employment decisions).

Weighing these factors, I conclude that Time Square and Navillus are not single employers.

### D.   Joint Employer

Defendants claim that Time Square and Navillus are "joint employers" and so Time Square is subject to the CBA signed by Navillus.[88]  The weight of the evidence strongly favors a conclusion that Navillus had no control over Albanese or Time Square's other employees.[89]  As with the single employer analysis, the finding that Navillus had no control over Time Square's employees is very significant.  Based on the circumstances of the whole activity, it is clear that Albanese was employed solely by Time Square.

Navillus's status as paymaster does not change this finding.  While the CBA states that Navillus concedes that it is a joint employer with any company for which it operates as paymaster, this provision is not binding on Time Square.[90]

---

[88]   *See* Def. Mem. at 13.

[89]   *See, e.g.,* Summ. ¶ 33 ("Time Square directed the work of Albanese."); 11/26 Tr. at 20 (defendants' counsel stated that "There is no question that the duties [of Albanese] were assigned by Time Square.").

[90]   While the CBA requires Navillus to concede that it is a joint employer, it cannot require Time Square to make that concession unless the CBA binds Time Square.  In short, the terms of the CBA would bind Time Square if the CBA applied to it.  But the contents of the CBA are irrelevant unless Time Square is considered a joint employer with Navillus – the signatory to the CBA.

23

If making use of a paymaster arrangement caused Time Square to become subject
to the CBA, there would be no need for the paymaster arrangement – once subject
to the CBA, Time Square would be a union company.  It defies common sense to
suggest that this is what the parties intended.[91]

## V.    CONCLUSION

For the reasons stated above, plaintiff's motion for a preliminary
injunction is granted.  The Clerk of the Court is directed to close this motion
(document no. 4 on the docket sheet).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            January 2, 2008

---

[91]    Because I find that Time Square and Navillus are neither joint nor
single employers, it is unnecessary to determine whether their employees
constitute a single bargaining unit.

24

## - Appearances -

**For Plaintiff:**

Joel Emmet Cohen, Esq.
Leila Rachele Pittaway, Esq.
McDermott, Will & Emery, LLP
340 Madison Avenue
New York, NY 10017
(212) 547-5566

**For Defendants:**

Lowell George Peterson, Esq.
Meyer, Suozzi, English & Klein, P.C.
1350 Broadway, Suite 501
New York, NY 10018
(212) 239-4999